Chief Loupe:
On behalf of the Norco Area Volunteer Fire Department, Inc. ("Fire Department"), you have requested an opinion of this office regarding the legality of the use of certain fire department vehicles purchased by the Fire Department and provided to the Fire Chief and Assistant Fire Chiefs. Specifically, you ask whether vehicles assigned by the Fire Department to the Fire Chief and the three (3) Assistant Fire Chiefs, all of whom are on 24-hour call to respond to emergencies, can be used for non-fire department business by the person assigned to the particular vehicle.
The Norco Area Volunteer Fire Department, Inc. is an all volunteer fire department located in Norco, La., and is one of nine such fire departments located in St. Charles Parish. Each fire department has contracted with the parish to provide fire protection within the fire protection district created by the parish pursuant to R.S. 40:1492. St. Charles Parish has the authority pursuant to La. R.S. 33:2101 to "enter into a contract with a private entity for the provision of fire protection services." According to your request, funding for the Fire Department comes from a 1/8 cent parish sales tax dedicated to the parish fire departments and from parish ad valorem taxes.
The issue presented by your request must be addressed in light of the provisions of La. Const. (1974) Art. VII, Sec. 14, and which contain the constitutional standard for the lawful use of public funds and property. La. Const. Art. VII, Sec. 14(A) generally prohibits the state and its political subdivisions from loaning, pledging or donating public funds, assets or property to persons, associations or corporations, public or private.
This office has long recognized the caution which must be exercised in the expenditure of public funds and use of public property. Historically, the Attorney General has followed the Louisiana Supreme Court's interpretation of La. Const. Art. VII, Sec. 14, as set forth in City of Port Allen v. Louisiana Mun.Risk, 439 So.2d 399 (La. 1983), wherein the Court states: ". . . this Section is violated whenever the state or a political subdivision *Page 2 
seeks to give up something of value when it is under no legal obligation to do so." The previous opinions of this office recognize that the requirement of a legal obligation to expend public funds or use public property is the threshold predicate for the constitutionality of an expenditure or use. However, this is not the only predicate. The expenditure or use must also be for a public purpose and create a public benefit proportionate to its cost. Attorney General's Opinion No. 90-63. See also: Attorney General's Opinions Nos. 02-0125; 01-0389; 95-141, 93-787, 92-722, 92-127 and 90-651.
As stated above, the threshold requirement is the presence of a legal obligation or duty by the public entity to alienate public funds or property. See Beard-Poulan, Inc. v. Dept. of Highways,362 F. Supp. 547 (W.D. La. 1973); Town of Brusly v. West BatonRouge Parish Police Jury, 283 So.2d 288 (La.App. 1st Cir. 1973). This prerequisite is satisfied by the presence of a valid statute, ordinance, charter or contract.
As noted above, La. R.S. 33:2101 authorizes parish fire protection districts to enter into contracts with private entities, such as the Norco Area Volunteer Fire Department, Inc., to provide for fire protection services within statutorily created fire protection districts. Clearly, this statutory framework constitutes valid legislation and, consequently, the presence of a legal obligation or duty on the part of the Parish Fire Protection District and the Norco Area Volunteer Fire Department, Inc., to enter into an agreement for the purpose of providing fire protection services and for the use of public funds to acquire vehicles to be used by the Fire Chief and Assistant Fire Chiefs.
It is also clear that a public purpose exists by providing 24-hour transportation for the Fire Chief and Assistant Fire Chiefs. According to your opinion request, the Fire Chief and Assistant Fire Chiefs are on 24-hour call to respond to incidents for the purpose of making an initial assessment of an emergency and establishing a command center. The requirement that the Fire Chief and Assistant Fire Chiefs be on 24-hour call serves a public purpose of providing for the prompt response of the Fire Chief and Assistant Fire Chiefs to emergency situations.
The fact that a vehicle might be used occasionally for some personal use does not render its cost to the public disproportionate to the public benefit realized in having rapid deployment of emergency decision-making personnel to an incident or emergency. Also see Atty. Gen. Op. No. 90-370. (Occasional personal use of public vehicle furnished to Hospital Administrator on 24-hour call does not constitute a prohibited donation of public property.)
Accordingly, it is the opinion of this office that the Fire Chief and Assistant Fire Chiefs of the Norco Area Volunteer Fire Department, Inc., all of whom are on 24-hour call, may use vehicles purchased with public funds and assigned to them for occasional personal use without violating Art. VII, Section 14 of the Louisiana Constitution. *Page 3 
We trust this adequately responds to your request. If you have any questions or comments, please do not hesitate to contact our office.
With kindest regards,
 Very truly yours,
 CHARLES C. FOTI, JR.
 ATTORNEY GENERAL
 BY: _________________________
 RICHARD L. McGIMSEY
 Assistant Attorney General
OPINION NUMBER 90-370
Mr. Ray A. Collins, Esq. Attorney General of Louisiana — Opinion. August 15, 1990.
 90-A-2 — PUBLIC FUNDS-Loan. Pledge or Grants La. Const. Art. VII. Sec. 14 (1974)
 Provision of automobile to hospital director on 24 hours call does not constitute prohibited donation of public property.
 Mr. Ray A. Collins, Esq. P.O. Drawer 1473 LaRose, LA 70373
WILLIAM J. GUSTE, JR., Attorney General
Dear Mr. Collins:
As the attorney for the Board of Commissioners of Lady of the Sea General Hospital of Lafourche Parish, you have requested an opinion of the Attorney General regarding a particular stipulation of an employment contract with the hospital director.
The present hospital director was hired in 1964, and has served continuously in that capacity in the 26 years since.
His present employment contract (and preceding one) provided that the hospital furnish him with a vehicle, which although primarily for official use was also authorized for personal use. He was furnished a Chevrolet in 1985, which he drove for 86,000 miles and five years. He has just been furnished another Chevrolet. His log in 1990 indicates that the car has been used for personal use only 11-12% of the time it has been operated.
You ask if there is any legal question regarding this stipulation of the hospital director's contract, who is in fact on call and must respond to the hospital 24 hours a day.
The legal issue presented is the use of public funds for private purposes. Is the furnishing of the automobile a donation of a public thing prohibited under La. Const. Art. VII, Sec. 14
(1974)?
Where the subordinate legal obligation to expend public funds is mandated by law, a public purpose and proportionate public benefit are presumed for the expenditure.
Where, as here, the subordinate legal obligation required by Art. VII, Sec. 14 for the constitutionality of the expenditure of the public funds is created by contract, a public purpose and a public benefit proportionate to the cost must be shown and not presumed.
The legal authority of the Board of Commissioners to contract with the hospital director is delegated by statute, LSA-R.S.46:1056(A).
The public purpose of providing 24 hour transportation for an individual with a 24 hour job is clear. It facilitates the prompt response of the director to the hospital when a problem arises.
The benefit realized is the retention of a career employee with 26 years of experience. That the vehicle might be used peripherally for some personal use does not render its cost disproportionate to the public benefit realized, particularly in the context of the public purpose for the expenditure.
On these particular facts, the provision of this vehicle to this employee as a condition of his contract of employment is legitimate.
Trusting this to be of sufficient information, I am
 Sincerely,
 WILLIAM J. GUSTE, JR.
 Attorney General
 BY:__________________________
 CHARLES J. YEAGER
 Assistant Attorney General

OPINION NUMBER 90-651
Honorable T.J. "Butch" Ward. Attorney General of Louisiana — Opinion. February 4, 1991.
 Honorable T.J. "Butch" Ward Councilman P.O. Drawer 9 Gretna, LA 70054
WILLIAM J. GUSTE, JR., Attorney General
Dear Mr. Ward:
You have requested an opinion of the Attorney General to determine whether community service grants by Jefferson Parish violate the prohibition of the Louisiana Constitution against donation of public funds.
Resolution 65953 of the Jefferson Parish Council sets forth the 1990 schedule of grants of parish funds to community service organizations. In consideration of these grants, each organization executed a contract with Jefferson Parish to provide certain services. The contract with the New Orleans Symphony is attached to your request as a sample. In exchange for a grant of $50,000, the symphony covenants to provide four (4) concerts during the 1990 calendar year, at least three of which will be within the geographical boundaries of Jefferson Parish. The symphony is responsible for transportation costs and rental expenses, and agrees to give free admission to school-age children residing in Jefferson Parish and discounted admission for all other Jefferson Parish residents. This contract may serve as a model for our constitutional analysis under La. Const. Art.VII, § 14 (1974) of whether such community service grants are prohibited donations.
Because of the number of opinion requests presenting Art. VII, § 14 questions, the Attorney General chooses to address your opinion request with a more comprehensive discussion of the constitutional principle than undertaken in previous opinions.
The contracts between Jefferson Parish and these private organizations are legally classified as cooperative endeavors. Cooperative endeavors between political subdivisions of the state and any "private association, corporation or individual" are authorized by La. Const. Art. VII, § 14C. However, Art. VII, § 14C supplements the prohibition against donations of Art. VII, § 14A. It does not create an exemption or exception from that general constitutional norm. The Louisiana Supreme Court has ruled that all cooperative endeavors authorized by Art. VII, § 14C, must also meet the general standard for non-gratuitous alienation of public funds or property established by Art. VII, § 14A. City of Port Allen v.La. Risk Management, et al, 439 So.2d 399 (La. 1983).
The City of Port Allen case considered the constitutionality of a state statute, the Louisiana Local Government Self Insurance Act, LSA-R.S. 33:1341 et seq., which created the Louisiana Municipal Risk Management Agency, a state agency which self-insured member municipalities from the risk of loss from worker's compensation and public liability claims. However, if the self-insurance fund was inadequate to pay a claim, all member political subdivisions were solidarily liable under the enabling statute for payment of the claim. The City of Port Allen filed suit to test the constitutionality of this provision under La. Const. Art. VII, § 14 (1974).
The constitutional prohibition of Art. VII, § 14 forbids the gratuitous loan, pledge, or donation of the "funds, credit, property or things of value of the state or of any political subdivision". This identical language and prohibition was present in Art. IV, § 12 of the Louisiana Constitution of 1921; Art. 58 of the Constitution of 1913; and Art. 58 of the Constitution of 1898. The substance and language of Art. VII, § 14 originated in Art. 56 of the Constitution of 1879:
 "The funds, credit, property or things of value of the state, or of any political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, association or corporation, public or private . . ."
The legal rule replicated in Art. VII, § 14 is thus one of the most enduring and formally consistent constitutional principles in Louisiana law. This is of some import for interpretation for it means that there is almost one hundred years of jurisprudence interpreting different constitutions but the identical provision in each.
The Louisiana Supreme Court took this approach in interpreting Art. VII, § 14 in City of Port Allen by recognizing as authoritative and adopting two cases decided under Art. IV, § 12 of the 1921 Constitution.
Town of Brusly v. West Baton Rouge Police Jury, 283 So.2d 288
(La.App. 1st Cir. 1973) held that because the police jury did not enjoy constitutional or statutory authority, much less a mandatory duty, to reallocate a percentage of sales tax revenues to the various municipalities of the parish, that its own resolution did not supply any valid legal obligation to do so, and the disbursement of police jury funds to the other political subdivisions was, therefore, gratuitous and an unconstitutional donation.
Beard-Poulan, Inc. v. Dept. of Highways, 362 F.Supp. 547
(W.D. La. 1973) held that moving or relocation costs were not compensable in Louisiana law for expropriations for highways, and such payments were charitable donations prohibited by the Louisiana Constitution. "The State and its agencies can only pay legal obligations," the federal court ruled.
Adopting the Brusly and Beard-Poulan interpretations, inCity of Port Allen the Supreme Court ruled:
 "The cases that do exist [under La. Const. Art. IV § 12 (1921)] hold primarily that this section is violated whenever the state or political subdivision seeks to give up something of value when it is under no legal obligation to do so. . . .
 Section 14(C) does not help the state, either. There is no indication that it is meant to be an exception to the rule of § 14(A); the exceptions are clearly contained in § 14(B). Thus, even if political subdivisions cooperate for a public purpose, they still may not give away their assets to other political subdivisions, the United States Government, or public or private associations or corporations, or to individuals merely for a `public purpose'." 439 So.2d at 401-402.
The Beard-Poulan decision had relied under the Erie doctrine upon James v. Rapides Parish Police Jury, 113 So.2d 88
(La.App. 2nd Cir. 1959) as the authoritative case interpreting La. Const. Art. IV, § 12 (1921). James adjudged the constitutionality of contributions of the police jury to the private association. The court found that the funds were used not to provide services to the public entity, but primarily used for promoting and sustaining public interest in the work of the Red River Valley Association. The James court held that the police jury had the statutory duty to build levees, dikes, drainage canals, etc., and that the duty authorized the jury to hire expert services or even hire private organizations to do the work the jury itself was empowered and obligated to undertake. However, public relations expenditures did not build levees, and the expenditure of public funds for that purpose was not within the scope of the duty authorized by the statute. James is faithful to the legal obligation/legal duty standard for determining the non-gratuitous and, therefore, constitutional nature of public expenditures. It makes two other points of importance to this constitutional doctrine.
The first is that the worthiness of the recipient and of the actual use of the public funds is immaterial to the constitutionality of its transfer by a public entity.
 "[T]hese specific prohibitions have been wisely implanted in our fundamental law, for it is conceivable that without such prohibitions the state, or a political subdivision thereof, might so deplete the public fisc by contributions to almost innumerable worthy private and semi-public enterprises as to seriously impair the necessary expense of conducting more prosaic but more important governmental functions." 113 So.2d at 93.
The second important statement of James is that custom, as expressed in the doctrine of contemporaneous construction, cannot modify or negate the operation of the prohibition of Art. VII, § 14. The doctrine of contemporaneous construction, the rule that a long-standing interpretation placed upon a statute by administrative officials should not be overruled without the proof of the error of the interpretation, is applicable only where the law being administered is ambiguous, and was, therefore, inapplicable to La. Const. Art.IV, § 12 (1921), the prohibitory terms of which were clear and unambiguous. Ibid.
Regardless of how long or how often any governmental entity has transferred funds to others, public or private, the duration and repetition of that practice does not create an exemption to the prohibition of Art. VII, § 14 by either contra legem custom or by the contemporaneous construction doctrine. La. Civ. Code Art.3. Past illegality will not justify future illegality. The only qualification to this rule is where customary employee benefitsin a valid contractual relationship evolve into a property right and became protected by due process. Jones v. City Parishof East Baton Rouge, 526 So.2d 462 (La.App. 1st Cir. 1988). The exception clause at the beginning of Art. VII, § 14 subordinates it to other constitutional fundamental guarantees, such as due process.
To further qualify an expenditure of public funds as non-gratuitous, the Attorney General has applied the "legal obligation or duty" standard as only a threshold requirement. The expenditure must also be dedicated to a public purpose and create a public benefit proportionate to the cost. A public purpose and benefit always presumed where the legal obligation or legal duty to expend the funds is derived from the authorization of the constitution, of a validly enacted statute, or home rule charter. Opinions of the Attorney General No. 90-519; No. 90-392; No. 90-161; No. 90-160. When no such presumption obtains, such as when the legal obligation for the expenditure is created by a contract authorized by constitution, statute or charter, the existence of the public purpose and proportionality of the public benefit must be shown. The public purpose and proportionality of the benefit requirements are implied by the substance of Art. VII, § 14 to distinguish lawful expenditures from donations, and have been recognized by prior jurisprudence.
Art. VII, § 14 of the 1974 Constitution thus has a paradoxical effect upon the fiscal policy of the state. On the one hand it limits and constrains the otherwise plenary power of the legislature over the public fisc. If a statute violates Art. VII, § 14, it is delegitimated and creates no lawful obligation or duty which justifies the expenditure or alienation of public funds. City of Port Allen, supra.
The far more important effect of the constitutional provision, contradictorily, is to enhance and potentiate the plenary power of the legislature over the public fisc in its constitutionalrelation to the political subdivisions. In order to lawfully spend public funds, all political subdivisions and agencies must conform to this fundamental standard for state wide fiscal policy, rather than formulate myriad, fragmented and distinct fiscal policies for each different jurisdiction of each governing authority. The "legal obligation or duty" standard safeguards the integrity of the legislative constitutional power. Opinion No. 90-516. Political subdivisions must have a direct constitutional duty or obligation to make the specific expenditure, or they must have such a duty or obligation delegated by their home rule charter, and such duty or obligation must subsume and logically justify the nature and purpose of the transaction in which public funds or property are transferred or alienated. Otherwise, and this is the great majority of cases in which an Art. VII, § 14 question is presented to this office for an opinion, the political subdivision must have a statutory duty or obligation to expend the funds, or transfer the public things of value, for a statutorily prescribed purpose that is constitutionally authorized, and by a means that is also authorized by law, even if discretionary.
With this discussion of the constitutional principle as context, the following issues are salient to your opinion request.
 1. Do any of the transfers of public funds by Resolution No. 65953 fall within the exceptions to the general prohibition of Subsection A as those exceptions are specified in Subsection B of Art. VII, § 14?
 2. Does the Jefferson Parish Council have any predicate legal obligation or duty to transfer these funds for the specified purposes?
 3. If so, does the contract in each case authorize an expenditure for a valid public purpose, and is the public benefit realized proportionate to the cost or value of the public?
 4. What is the source in law of the predicate legal obligation of the Council to transfer these funds? Is it the Louisiana Constitution, the general state law, or the home rule charter of Jefferson Parish?
 EXCEPTIONS
The expenditure of $12,000 listed in the schedule of community service grants enabled by Resolution 65953 which is dedicated to the Metropolitan Battered Women's Program, and the $5000 dedicated to the Special Children Are Priviledged program, are directly authorized by the Constitution. The exceptions of Art. VII, § 14B authorize certain kinds of donative-type expenditures and, thereby, implicitly recognize that such expenditures are necessary for the inherent functions and duties of government.
Art. VII, § 14B, in pertinent part, provides:
 "Nothing in this section shall prevent (1) the use of public funds for programs of social welfare for the aid and support of the needy. . . ."
The Attorney General concludes that battered women (and their children) and special needs children are encompassed within the definition of `needy" in § 14B. Therefore, Jefferson Parish is constitutionally authorized, without an underlying legal obligation created by its home rule charter, by statute, or by a legally authorized contract, to provide direct grants of public funds to these programs. Expenditures authorized by the exception subsection of § 14B are not subject to the prohibition of § 14A. No legal obligation independent of the constitutional authorization of § 14B is required, for the grants are authorized donations by a public entity.
Jefferson Parish is constitutionally authorized to provide programs of social welfare for such needy persons itself, directly. Therefore, it is authorized to fiscally enable private programs serving the same public purpose of assisting the needy, even by gratuituous grants of public funds.
 LEGAL OBLIGATION OR DUTY
The threshold element of the constitutional doctrine for distinguishing between invalid donations and lawful expenditures and transfers is the presence of a legal obligation or duty by the transferor to alienate the public funds, rights or property.
This element typically requires three separate determinations:
 1. Is there a prima facie obligation or duty in law to expend public funds or transfer public rights or things?
 2. Is the authority for the obligation or duty legally valid, i.e., is the statute, ordinance, charter or contract itself either unconstitutional or ultra vires?
 3. May the legal obligation or duty required for constitutional validity nonetheless authorize some measure of discretion to the public body or officers as to the means for performing the duty or obligation, or must the legal character of the duty or obligation be mandatory to justify the expenditure or transfer as non-donative under Art. VII, § 14? May the obligation or duty be mandatory as to its governmental purpose, but discretionary as to means, if the means is also authorized by law?
That transfers of public property, funds or things of value are donations prohibited by the Constitution unless authorized by an obligation or duty arising from law is a principle of Louisiana constitutional law second only to the separation of powers doctrine in venerability.
A prohibition against donation identical in form and substance to Art. VII, § 14A is present in the 1879, 1898, 1913 and 1921 Constitutions. Every court interpreting these identical provisions has hewed to the standard of legal obligation or duty for distinguishing between lawful expenditures or transfers and unconstitutional gratuities. State ex rel Orrv. City of New Orleans, 50 La. Ann. 880, 24 So. 666 (1898);James, supra; Town of Brusly, supra; Beard-Poulan, Inc.,supra; City of Port Allen, supra; Guste v. Nicholls CollegeFoundation, 564 So. 682 (La. 1990). All of these cases are recognized by the Attorney General as authoritative for interpretation of La. Const. Art. VII, § 14 (1974).
The threshold requirement under Art. VII, § 14 is, therefore, that the alienation or transfer be justified or mandated by a valid obligation or duty, arising from positive law or its equivalent, for the public purpose specified by the obligation or duty.
However, a transfer of funds or property may be authorized by a legal obligation or duty arising from a statute, ordinance or contract and still constitute an unconstitutional donation. If the authorizing statute, ordinance or contract is ultra vires
or unconstitutional, it creates no binding legal obligation for the expenditure or alienation of property, credit, etc. Likewise, obligations authorized by a home rule charter have to be examined for a constitutional conflict or delegitimation, and ordinances enacted and contracts entered upon authority of the home rule charter which are substantively inconsistent with the duty authorized, or which trespass beyond the scope of such authority are ultra vires and violate Art. VII, § 14 for lack of a valid legal obligation or duty. The determination of a prima facie legal obligation or duty is the first step of the analysis. The second is to determine the substantive legal viability of the legal obligation or duty facially present.
The importance of the viability of the obligation within the entire constitutional and statutory framework has been emphasized by the Supreme Court. In City of Port Allen, the legal obligation of solidary liability between municipalities was invalidated because the mandating statute, R.S. 33:1349, exceeded the limitations placed upon the plenary power of the legislature by Art. VII, § 14. Guste upheld the obligation and duty standard, but specifically noted that such a duty to transfer public funds be "under authority of the constitution and the laws of this state in furtherance of a public purpose." 564 So.2d at 688. In James, the police jury had been constitutionally authorized by statute to build levees, but the cash contribution to the Red River Valley Association wasultra vires, and, therefore, an unconstitutional donation, because the Association didn't build levees. It's activity was to persuade others to do so, and public relations was not within the scope of the statutory authority. A public entity cannot finance another private or public entity to undertake an endeavor, no matter how worthy, which it itself is not authorized and obligated to undertake, and which would be ultra vires or unconstitutional.
The import of City of Port Allen is that just as municipalities may create legal obligations to transfer funds by ordinance or contract only if they are authorized by the constitution, statute, or home rule charter, so the legislature may create legal obligations only if the statutory means as well as the public purpose achieved through those means are both constitutionally authorized.
In Guste the Supreme Court found the transfer of public funds from the quasi-public Alumni Federation to the private College Foundation constitutional because such transfer was an authorized means "in furtherance of the Foundation's discharging its constitutional or legal duties of furthering public education." Implied in this ruling was the finding that both the means and the end were authorized by both the constitution and the statutes enacted to enable the constitution.
City of Port Allen is distinguished because the statutory means was unauthorized. There is no specific or express constitutional delegation of power to the legislature to authorize a cooperative self-insurance regime for municipalities which incorporated solidary liability between members. The statute imposing solidary liability upon participating municipalities for the liability of other municipalities had been enacted through the plenary power of the legislature.
The general constitutional context for the plenary power of the legislature was stated by the Louisiana Supreme Court inDirector of Louisiana Recovery District v. Taxpayers,529 So.2d 384, 387 (La. 1988):
 "[I]t is a general principle of judicial interpretation that, unlike the federal constitution, a state constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature. In its exercise of the entire legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit. Thus, to hold legislation invalid under the constitution, it is necessary to rely upon some particular constitutional provisions that limits the power of the legislature to enact such a statute."
Presumably, such a limitation may be expressly provided or implied necessarily by the structure of government established by the constitution.
City of Port Allen presents the violation of the prohibition of Art. VII, § 14 by R.S. 33:1341 et seq. as a direct violation. Analytically, this is misleading. If R.S. 33:1342 etseq. is validly enacted through the legislative plenary power and creates a legal obligation or duty for the municipality, how can the payment of a municipality's funds to satisfy another's liability be a prohibited donation under the legal obligation or duty standard of Art. VII, § 14 declared by the same decision? There must be a fundamental constitutional infirmity in the exercise of power by the legislature which nullifies the validity of the legal obligation or duty created by the statute, and which then secondarily delegitimates the statutory scheme under the prohibition of Art. VII, § 14.
In our opinion the plenary power of the legislature was unconstitutionally exercised, thereby invalidating the obligation of solidary liability imposed by the statute, because it adopted an unconstitutional (if not contradictory) means to implement the valid public purpose of fiscal soundness for municipalities. The means chosen, solidary liability of all municipalities to insure the fiscal solvency of any, unconstitutionally infringed upon the sovereignty of municipal governments. This interpretation is implicit in Chief-Justice Dixon's opinion, but not express. The inference of the opinion is that because the statute infringed upon the legal sovereignty of the municipality — including the right to be legally responsible for only one's own debts — the exercise of plenary power of the legislature infringed upon power granted to municipalities by the constitution. Therefore, the statutory duty was invalid, and could not satisfy the prohibition against gratuities of Art. VII, § 14 because of the want of legal efficacy of the prima facie obligation or duty.
If the constitution does grant a limited sovereignty to municipalities this analysis is consistent with the basic principle of constitutional interpretation that the constitutional provisions are not so much grants of power as limitations on the otherwise plenary power of the legislature.
There is authority for this analysis in the Recovery District
case:
 "One of the main objectives of Art. VI of the Constitution on local government was to remove from the Constitution the great mass of material on the subject of special districts and to leave to the Legislature the responsibility for providing for special districts authorized by law. Another objective was to make parishes and municipalities more than mere creatures of the Legislature through constitutional grants of self-operative powers. By pursuing these objectives the delegates hoped to eliminate the need for continual amendment of special district and local government provisions and to grant a greater degree of self-government and independence from the Legislature to municipalities and parishes. XVIII Records of the Louisiana Constitutional Convention of 1973; Verbatim Transcripts, September 19, 1973 at 41, 44-45, 47; Kean, Local Government and Home Rule, 21 Loy. L.Rev. 63 (1975). . . .
 To facilitate these objectives a special district is classified by the local government article as a "political subdivision", which is the basic substate unit of government and generally subject to legislative control. La. Const. 1974, Art. VI, § 44(2). On the other hand, municipalities and parishes are specially classified as "local governmental subdivisions" and granted significant self operative powers. La. Const. 1974, Art. VI, § 44(1); see La. Const. 1974, Art. VI, § 26, 27, 28, 29, 32." La. Recovery District, 529 So.2d at 388.
Kean's analysis supports the interpretation by the Supreme Court that the 1974 Louisiana Constitution in its multiple provisions does contemplate and establish a relative form of sovereignty for municipalities, in contrast to the traditional doctrine that municipalities were subject to the absolute control of the legislature:
 "Art. VI [of the 1974 Louisiana Constitution] was clearly drafted with the designed purpose of altering the relationship between the Legislature and local government from that which existed under the 1921 Constitution. . . .
 In order to place these changes in proper perspective, it is appropriate to briefly analyze the state-local governmental relationship . . . under the 1921 Constitution. With rare exception and then only upon the basis of positive constitutional directive, the Louisiana courts have viewed local governmental agencies as mere "creatures" of the legislature. . . .
 In furtherance of this rationale, the courts have consistently recognized that the Legislature has the right and authority not only to delegate local government powers, but also to withdraw then and to impose its own will regardless of local needs or capacity to provide what the Legislature mandated.
 . . . [I]t is fair to say that the principle of legislative dominance in local affairs has heretofore been the basic premise of Louisiana local government law and that it was the designed purpose of the drafters of Art. VI, to change this." 21 Loyola Law Review 63, 64-66 (1975).
It is noteworthy that the sections of Art. VI cited by the Supreme Court in La. Recovery District to exemplify the new relative sovereignty of municipalities under the 1974 Constitution were those empowering the local governmental subdivisions in the field of public finance, and providing for their fiscal independence even in the face of legislative caprice.
Presuming that some measure of municipal sovereignty is established or implicit within Art. VI, the fundamental attribute of sovereignty is the right to exist. For a political entity, this requires financial solvency if not viability. To the extent a statute enacted under the plenary power of the legislature mandates the possible destruction of a municipality's financial solvency and viability through a mandated solidary liability for the torts of another public entity, the plenary power is limited by the scope of the sovereignty of the municipality contemplated by the Constitution. Legislative power which compromises if not negatives the financial solvency of municipalities is unconstitutional or, perhaps more accurately, an ultra vires
exercise of a valid constitutional power of the Legislature.
Thus is presented a law which intends to achieve a valid constitutional purpose by an unconstitutional means — mandated solidary liability. Both the legal means and the end have to be equally legitimate and constitutionally authorized to create a valid statutory duty or obligation with legal efficacy to justify the transfer or alienation of public funds or property under Art. VII, § 14(A) and (C).
Because the legal obligation purported to be created by R.S.33:1341 et seq. was delegitimated in this constitutional context, there was no legal obligation to justify the use of one city's funds to pay the liability of another, and the statute attempted to oblige a prohibited donation of public funds or things of value from one public entity to another. The Supreme Court correctly found this to violate Art. VII, § 14.
Justice Dixon did not offer an explanation as to why the statute in City of Port Allen did not create a valid legal obligation. That part of the analysis of the case is the interpretation of the Attorney General rather than the original opinion of the Supreme Court. It is offered to support the legal inefficacy of the statutory obligation as a silent intermediate step in the judicial analysis for the correct conclusion of the Court that the solidary liability intended was a prohibited donation, because there was no valid law mandating such liability.
Hence, it is only where the exercise of plenary power does not infringe upon other powers or prohibitions which limit and condition the plenary power that it may constitutionally justify a legal obligation or duty authorized by law. R.S. 33:1344 was a constitutionally ultra vires exercise of the plenary power.
The final question is whether Art. VII, § 14 is violated if the authorizing provision of law for the expenditure of funds provides for some discretion by the public entity rather than strictly mandating a public duty or obligation. Can a statute, for example, which authorizes a contract to accomplish a specified and legally authorized public purpose violate Art. VII, § 14, in that the parish, municipality or subdivision is notobligated to contract or otherwise mandated to use public funds or property?
This question is addressed by the first interpretation of the Louisiana Supreme Court of the constitutional principle, and the most recent, in the two decisions 93 years apart but still consistent with one another.
In Guste, the Alumni Federation of Nicholls State University was under no mandatory duty to contribute funds to the Nicholls College Foundation; the transfer of funds was a discretionary act:
 "In 1984, the Board of Directors of the Alumni Federation decided to give ten percent (10%) of all student assessed fees received thereafter by the Federation from the University. This payment was apparently unsolicited, and the specific purpose not evident, at least insofar as revealed by this record." 564 So.2d at 684.
The court, however, found that the legal purpose for the transfer and expenditure of the funds was provided by the Articles of Incorporation of both the Federation and the Foundation. The corporate purpose of the Alumni Federation which limited and defined its authority to certain purposes for which its public and private funds could be used provided that the Federation's purpose was to "foster, protect, and promote the welfare of Nicholls State University." Supra, at 685. The Articles of Incorporation of the Foundation specified that its purpose was to "promote, stimulate and improve the educational and material welfare of Nicholls State College." Ibid The Supreme Court then found that the corporate purposes of the two organizations were congruent if not identical with the University's constitutional and legal duty or obligation to provide an excellent public post-secondary education to the students of the Nicholls State University. Therefore, because of the parallel legal purposes of the institutions and their close association, the duty or obligation of the Alumni Federation to transfer money to the Foundation was derived from and authorized by the University's primary educational obligation created by law, even though the Federation's transfer was an act of discretion, not mandated either by law or its articles of corporation. However, the purpose for which the money could be spent was mandated both by the universities legal duties and the legally binding corporate purposes of the two non-profit organizations affiliated with the university.
 "The Foundation has undertaken, as its purpose, assistance to the University, its faculty, and its students, by promoting public education, a purpose that coincides with the University's and the Federation's constitutional and legal duties. The transaction between the Federation and the Foundation constitutes a transfer of public funds (rather than simply a donation which is prohibited by La. Const. Art. 7, § 14(A)). . . . . Because the objectives of the Federation, the Foundation, and the University coincide in the furtherance of a government purpose, and because a simple donation would be illegal under La. Const. Art. 7, § 14(A), we find that the money was given and accepted "under authority of the constitution and the laws of this state" in furtherance of a governmental purpose. It was not a donation in the sense contemplated by La. Const. Art. 7, § 14 (A)." 564 So.2d at 688 (Emphasis added).
This is known in ethics as a teleological analysis, "telos" being the Greek word for "the ultimate end or objective". We have previously seen that both the means and the end sought by a government expenditure of public funds must be authorized in law. Neither can be an ultra vires action under the applicable constitutional or statutory scheme. Guste holds that the legal obligation or duty standard developed since the 1879 Constitution applies to the government end or objective mandated by the legislature which the alienation of public things is intended to actualize or which it cultivates. Hence, there is no discretion as to the choice of the public purpose by the public entity; it is either mandated by law, or it does not exist in law.
The power to define and promulgate the ultimate objectives and purposes of the acts, obligations and duties of government originates strictly within the constitution, and in a secondary sense, in the will of the legislature. Therefore, a primary constraint of Art. VII, § 14 is that no political subdivision has inherent power, regardless of what measure of sovereignty it enjoys, to expend public funds to serve or accomplish its own perception of the public good, or a public purpose defined derivatively therefrom, if the character of the public purpose so defined is inconsistent or materially contradictory with the public duty or obligation authorized by law. This is the teleological analysis incorporated into Anglo-American jurisprudence, expressed once more in Guste.
There is a distinction between authorized by law and mandated by law. Under Art. VII, § 14, the end must be validly mandated, but the means must only be authorized in law. Often there may be many different authorized means for a governmental entity to use to achieve a mandated government purpose. If a political subdivision has the duty or obligation to perform certain acts, and it might either perform them by public means, by itself through the resources of government, or by private means, if the political subdivision is expressly authorized to contract with private persons or entities to fulfill this equally mandated function of government, then either choice of means is constitutional under Art. VII, 14(A) and (C).
In City of Port Allen, the public purpose — the provision for the fiscal soundness of the municipalities — was a valid public purpose for which the legislature had a constitutional duty to provide. Art. VI, § 19. However, the means — solidary liability between the municipalities — was not validly authorized in law. Therefore, one municipality giving its funds to satisfy the tortious liability of another was donative, and a gratuity violative of Art. VII, § 14(A) and (C).
Is the transfer of $50,000 of public funds from Jefferson Parish to the New Orleans Symphony upon specified reciprocal obligations by the orchestra, a private organization, constitutional?
This issue is the reverse of City of Port Allen; it more closely approximates Guste. Indeed, the most germane authority is State ex rel Orr v. City of New Orleans, the first interpretation by the Louisiana Supreme Court of the constitutional prohibition against donation of public things or property.
The question of the authority in law for the means for fulfilling a mandated government function is perhaps the easier of our two-fold means to end analysis. While this writer does not have a copy of the Jefferson Parish Charter, unquestionably it authorizes the parish governing authority to enter into contracts with others for lawful purposes.
Further, such power is to be exercised in proper form by the governing authority. Resolution No. 65953 authorizes the confection of the contracts, and specifies the amount of public funds to be transferred under the obligations of the contracts.
Although the ordinance does not facially require it, the contract with the New Orleans symphony does establish reciprocity of performance by the parties.
If an enforceable and authorized contract is perfected, it may provide a valid legal obligation to justify the transfer of the $50,000 as non-gratuitous and constitutional under Article VII, but the contractual obligation, being discretionary in its assumption, must itself be subsumed by a mandatory duty and obligation of the Parish of Jefferson to actualize or achieve a specific public purpose which the contractual obligation to pay money furthers.
The public purpose of the contract with the New Orleans Symphony is the cultural and spiritual enrichment of the citizens of Jefferson Parish. Does the Louisiana Constitution impose any legal duty or obligation, to be enabled by ordinance and contract, to provide for the spiritual, emotional and cultural well-being of the citizens of Jefferson Parish?
The police power is the power of a government to promote or to protect the public health, safety, morals, peace or general welfare. City of Shreveport v. Curry, 357 So.2d 1078 (La. 1978); City of Lake Charles v. Henning, 414 So.2d 331 (La. 1982); Francis v. Morial, 455 So.2d 1158 (La. 1984).
Although always delegated from the state either through the constitution or the legislature in the creation of a governing authority, the police power is inherent in every governing authority of local governmental subdivision as well as the state.Wes-T-Erre Dev. v. Parish of Terrebonne, etc, 416 So.2d 209
(La.App. 1st Cir. 1982). "It is a power inherent in every sovereignty to govern men and things. . . ." Fernandez v. Alford,13 So.2d 483 (1943).
A home rule charter is a means by which the police power of the state is delegated to the parish or municipality directly from the Constitution through Art. VI, § 5. This delegation of authority grants the home rule charter government, in affairs oflocal concern, powers which within its jurisdiction are as broad as that of the state, except when limited by the constitution, laws permitted by the constitution, or its own home rule charter. Francis v. Morial, 455 So.2d at 1171.
The most common expression of the police power is by negative, prohibitory actions by the governing authority. Yet, the purpose (the teleology) of the police power is not simply to protect the public health, safety, morals, peace or general welfare, but also to promote these public purposes affirmatively. City of Shreveportv. Curry, supra; Francis v. Morial, supra; City of Lake Charles, supra;City of Shreveport v. Restivo, 491 So.2d 377
(La. 1986).
The ultimate question, therefore, is whether multiple opportunities to hear Mozart and Beethoven performed by a first rate orchestra bears a rational relation to the mental and spiritual health and the general welfare of the people. We find that it does, and that the police power, which is also a duty of government, provides a predicate legal obligation for the use of public funds to provide this type of civic enrichment for the public.
The police power is an affirmative as well as a prohibitory power to implement the duty of government to promote health, safety, morals, peace or general welfare.
This construction is validated by the Orr case, the first decision to interpret the principle now retained in Art. VII, § 14(A).
In Orr, the Supreme Court invalidated as prohibited donations appropriations by the New Orleans City Council which authorized the transfer of public funds to a bona fide charitable organization which cared for orphans. The issue was whether such transfer violated Art. 56 of the Louisiana Constitution of 1879, containing the same prohibition now provided by Art. VII, § 14(A) of the 1974 Constitution, and expressing the prohibition in the same language (Art. 56 did not contain an exception for the needy now stated in Art. VII, § 14B).
Art. 163 of the 1879 Constitution directly delegated to municipal corporations the police power of the State to care for infirm, sick, disabled paupers. This was also the delegation of a duty to use this power as a means of promoting the public health and general welfare, two of the public purposes which the police power must reasonably tend to accomplish to be constitutional.
The Orr court found that even if the constitutional provision was not operative, and even though the legislature had enacted no statute to implement the constitutionally delegated power or duty, nonetheless the city had an inherent duty to care for this class of citizens, presumably through the police power inherent to its sovereignty created concurrently and incidentally to the creation of the municipal corporation:
 "[W]e are not called upon in the case to say whether legal proceedings could be legally taken to coerce the city to make provisions for such persons, but whether when they had done so their action would have been unauthorized, in the absence of a statute of the state making it obligatory upon them to do so. We have no hesitation that, if the only attack made upon the action of the city would have been the absence of a statute, it would have been utterly groundless. There can be no question as to the duty of cities to support indigent sick, disabled and infirm persons within their borders, but the question is how, and under what circumstances and conditions, are they to do so . . . Had the city made express contracts, either with individuals or with private corporations by which the latter would have come under a well-defined civil liability to perform such duties for the city, the officers of the city having legal power to exact performance according to the terms of the contract, and to hold such parties liable to the terms of the contract, and had the city passed ordinances appropriating money to carry out its obligations towards the other contracting parties under such contracts, and the validity of such appropriations submitted to us, a very different question would have been presented from that actually before the court. . . . We do not understand the amount of the appropriations to the different institutions to be graded upon any fixed relation between such amounts and services which could be legally charged for by each, as based upon a precise legal consideration received . . . These moneys, at the best, would be received by way of possible anticipated future benefits not be reason of contract, express or implied." Supra,
24 So. at 670-7671.
The Orr case authorizes in one decision all three elements of the Attorney General's three prong formula for determining the constitutionality of transfers of public property or funds lender Article VII, § 14. Those predicate elements are 1) legal obligation or duty to transfer or alienate the public property 2) which is directed to a specific public purpose and which 3) creates or enhances a public benefit of a value proportionate to the cost of creating it.
Orr also demonstrates that under the police power, and under most cooperative endeavors, a contract authorized by action of the governing authority is required to justify the expenditure or transfer with a legal obligation. The police power, Orr holds, justifies the funding of other public or private entities only when the other entity is to use the funds to perform a public function which it is the lawful duty of the governing authority itself to perform. The recipient public or private entity acts as a surrogate for government, much as the Nicholls College Foundation did in Guste. The purpose of the legal obligation rule is to require that the recipient public or private entity use the funds transferred only for that purpose obligated by law. The duties created by the police power are far too broad to specify the means by which the funds are to be lawfully used for the public purpose. This is why the Orr court stated that the reason for the unconstitutional donative nature of the appropriation was not the existence of a lawful duty of the governing authority to affirmatively ameliorate the suffering of the poor, which was a legitimate public purpose, but "how, and under what circumstances and conditions, are they to do so."
A contract creates the required legal obligation that the recipient expend or use the public funds only for the public purpose that is the object of the City's duty in law. Instead of a legal obligation for the City, it is a legal obligation upon the recipient. Either way, it satisfies the requirement the either the public body if it spent the funds itself, or any other public or private entity to which it transfers public funds or property so it may effectuate the duty of the government, can only use such public things of value for the specific public purpose established by law, and no other.
The transfer of public funds in Guste did not have to be enabled by contract because the necessary legal obligation was supplied by the articles of incorporation of the private recipient entity. Under its articles of incorporation, the Nicholls College Foundation by law was forbidden to use the money for any other purpose than the same public purpose the transferring Alumni Federation and the University were mandated to use the public funds for by the Constitution and laws. The nature of the Foundation's discretionary use of the money being limited by a binding legal obligation that was authorized in law, there was no requirement in Guste for a legal obligation to be created by contract.
The legal obligation constitutionally required by Article VII, § 14 merely states the legal form of the core value protected and implemented by Art VII, § 14 ____ that public property, funds and things of value be used, either by the public owner or the recipient, not for any public purpose which can be rationally justified as incidental to public policy, but only for the public purpose established by law. The legal character of the use for only the legally prescribed purpose is decisive to whether or not it constitutes an unconstitutional donation. Expenditure of public funds for a valid public purpose not specifically authorized by law in the factual context is nonetheless an unconstitutional donation. Any public purpose just won't do.City of Port Allen, 439 So.2d at 402.
The police power, therefore, merely supports a duty, and authorizes but does not obligate the contemplated use of public funds. In order to limit such use to a legal authorized purpose because of the general nature of the public purposes which authorize expenditures through the police power, a legal obligation must be created by a contract between the governing authority and the intended recipient performing the authorized public duty vicariously.
Of course, the other limitation on the police power as the legal authorization for expenditure is that it is only possessed and lawfully exercised by governing authorities, Wes-Tx-ErreDev. v. Parish of Terrebonne, supra, at 214; Hi-Lo OilCompany v. City of Crowley, 274 So.2d 757 (La.App. 3rd Cir. 1973), or delegated by the constitutional governing authority. Hence officers and political subdivisions of the state cannot exercise police power or assert it as a justification for the alienation of public things of value unless that public power is expressly delegated to them by constitution or statutes. The same is true for expenditures or use or transfer of public funds, credit or other property by municipal or parochial subdivisions unless that police power has been legislatively delegated by the municipal or parochial governing authorities.
With regard to the Jefferson Parish contract, the remaining issue is whether the performance of the legal obligation assumed by the New Orleans symphony creates a benefit for the public proportionate to the cost.
The symphony convenants to perform four public concerts, at reduced admission for Jefferson Parish residents, with performances being given in three of those concerts in Jefferson Parish. The benefit to the people of Jefferson Parish to hear a fine orchestra is intangible, but substantive, and one of the important contributions which government can make to the quality of urban life. In exchange, Jefferson Parish transfers $50,000 to the symphony. That allocates to the Symphony $12,500 for all the musicians, rehearsal, technicians, support personnel, and expenses for each performance. If there not be an exact equivalence present in the symphony's obligation, it is precise and proportionate, and it is legally enforceable and therefore obligatory.
The transfer of $50,000 of the public funds by this local governmental subdivision of the state through its governing authority under the terms, conditions and obligations of the contract with the New Orleans Symphony is constitutional under Art. VII, § 14(A) and (C).
Because you have not furnished to me the other contracts which create legal obligations for the recipients of these community service grants, it is impossible for the Attorney General to apply the proportionality test and render an advisory opinion as to their lawfulness. The validity of those contracts should be evaluated in light of the constitutional principles analyzed by this opinion.
The following principles of interpretation of this constitutional provision may be summarized as follows:
1) Any expenditure of public funds or alienation or use of any public things of value must be mandated by a legal obligation which obliges such use for a definite and lawful public purpose.
2) The predicate legal obligation may be created by any normative source of law, which has coercive and binding effect. These include the constitution, statutes, ordinances which are law rather than enabling acts, home rule charters, corporate articles of incorporation, and contracts which are validly authorized by an independent source of law.
3) If the public purpose for the use, alienation or expenditure is legally obligatory upon the public body or officer, or in some cases the recipient, the actions taken — the means for the public purpose sought — must also be lawful.
4) A statute, ordinance, home rule charter, articles of incorporation or other source of a legal obligation which dedicates the use of public property to a specific public purpose creates a presumption that such use or transfer serves a public benefit proportionate to the cost.
5) Where the legal obligation arises from a discretionary power or duty expressed in a contract, such as in the police power, the public benefit and its proportionality are not presumed but must be shown.
6) An ultra vires statute, ordinance, contract, etc. creates no legal obligation under Art. VII, § 14.
7) The public purpose for the alienation, use or transfer of public things of value must be mandated by a legal obligation or duty and must be accomplished or facilitated by actions which are a lawful or authorized means to the realization or achievement of that public purpose. This is the constitutional norm of La. Const. Art. VII, § 14.
Trusting this to be of sufficient information, I remain
 Sincerely,
 WILLIAM J. GUSTE, JR.
 Attorney General
 BY: ______________________
 Charles J. Yeager
 Assistant Attorney General

 OPINION NUMBER 92-722
Judge Charles Williams Roberts. Attorney General of Louisiana — Opinion. November 23, 1992.
92-A-A Recreation-Recreational Boards
90-A-1(a) Public Funds and Contracts Construction
90-A-2 Public Funds-Loan, Pledge
Art. 7, Sect. 14 of La. Const.
R.S. 33:4570.3
 BREC may enter into a cooperative endeavor with the Santa Maria Partnership in Commendam to share the cost of a public access road and to pay for a railroad grade crossing to afford access to the Santa Maria Golf Course.
 Judge Charles Williams Roberts Attorney at Law 1626 Applewood Road Baton Rouge, LA 70808
RICHARD P. IEYOUB, Attorney General
Dear Judge Roberts:
You have requested an opinion from the Attorney General, on behalf of the Recreation and Park Commission for the Parish of East Baton Rouge (BREC), relative to the provisions of a contract of cash sale executed on January 23, 1990, between BREC and the Santa Maria Partnership in Commendam (Santa Maria). Pursuant to the contract, BREC purchased 33.786 acres of land, as well as various non-exclusive servitudes of access and passage, all of which are part and parcel of the Santa Maria Golf Course property. BREC, under separate act of sale, previously acquired the major portion of the golf course acreage — the 33.786 acres and servitudes representing the residual properties not included in the original purchase.
The act of sale to acquire the 33.786 acres provides that the consideration for the property conveyed is payment of the sum of $800,000 cash, one-half the cost of the permanent entrance (i.e., public access road), not to exceed the sum of $200,000, to be installed by Santa Maria or its successors in title, and the total cost for the installation of a 100 foot permanent grade crossing traversing tracts owned by the Kansas City Southern Railroad. The cost of the grade crossing has been estimated to be approximately $100,000. The permanent entrance road will be a public road constructed in conformity with the requirements of, and located on property dedicated to, the City/Parish of East Baton Rouge. The road and grade crossing will afford the general public access to the golf course and its related facilities (i.e., clubhouse, etc.).
The remaining property adjacent to the golf course was sold by Santa Maria to Charles J. Cole, Jr., owner of Cole Development Company, Inc. (Cole). Cole contracted with Barber Brothers Contracting Company, Inc. (Barber Brothers), the lowest of four bidders, to construct streets, drainage, sanitary sewer, and sidewalks, including the entrance road and drainage appurtenant thereto. You state that construction costs associated with the entrance road may be in excess of $400,000. BREC expects to receive invoices from Cole for reimbursement for its $200,000 share in the very near future.
By letter to you dated October 12, 1992, BREC has advised that, due to safety considerations, the railroad will not permit the construction of a grade crossing of its tracks, but rather will require a bridge or tunnel, the cost of which will exceed that of the grade crossing stipulated in the contract. Your recommendation to BREC is that they are not obligated for any cost over and above those attributable to a grade crossing.
While it is your opinion that BREC may carry out its obligations under the act of cash sale relative to the $200,000 reimbursement for access road construction, and reimbursement for the cost of the grade crossing, you have requested our review and opinion on same.
The constitutional norm for the lawful use of public funds and property is found in La. Const. Art. VII, Section 14 (1974). Paragraph (A) generally prohibits the loan, pledge, or donation of public funds. Exceptions to this prohibition are found in Paragraph (B), all of which are inapplicable to the case at hand.
Paragraph (C) of Section 14 authorizes the state and its political subdivisions (e.g., BREC) to engage in cooperative endeavors for a public purpose with other governmental agencies, public or private corporations, or individuals. However, Paragraph (C) supplements the prohibition against donations in Art. VII, Section 14 (A). It does not create an exemption or exception from the general constitutional norm. The Louisiana Supreme Court has ruled that all cooperative endeavors authorized by Art. VII, Section 14 (C), must also meet the general standard for the non-gratuitous alienation of public funds or property established by Art. VII, Section 14 (A). See City of Port Allenv. La. Risk Management, et al, 439 So.2d 399 (La. 1983).
Despite the authorization of cooperative endeavors, Section 14 (A) is, nevertheless, violated whenever a political subdivision seeks to give up something of value in the absence of a legal obligation to do so. In other words, only if the transfer of public funds is required by a valid legal obligation will it be considered a constitutionally sanctioned cooperative endeavor.
The requirement of a legal obligation to expend public funds or to use public equipment and labor is the threshold, but not the only predicate for the constitutionality of the expenditure. The expenditure must also be for a public purpose and create a public benefit proportionate to its cost. See Opinions of the Attorney General Nos. 90-651 and 90-392. A public purpose and benefit are presumed where the underlying legal obligation for the expenditure is created by the constitution, a statute, or an ordinance.
The powers and duties of BREC are set forth in LSA-R.S.33:4570.3. It provides, in pertinent part, the following:
 "A. The commission shall have perpetual existence and shall have the right and power to incur debts and contract obligations; to sue and be sued; to acquire by purchase, donation, expropriation, and otherwise, from other political entities or from any other source, money and property, movable and immovable, tangible and intangible, and to own, administer, alienate, and otherwise dispose of the said money and property; to contract generally; to adopt an official seal; and generally to have and enjoy all of the rights, powers, and immunities incident to public corporations engaged in public recreational and public park purposes. The powers and duties of the commission shall be inclusive of the right to own and acquire, and to develop and administer, lands for public parks, and other properties and improvements, movable and immovable, tangible and intangible, as well as additional rights, leases, concessions, and privileges for public recreational and park purposes generally. The commission is vested with full power to adopt and promulgate rules and regulations within the scope of this Section to apply to its own governmental functions, and to control and regulate the public recreational and park facilities under its jurisdiction." (Emphasis added.)
As can be seen from the above, BREC is vested with broad and sweeping authority to develop and administer lands for public parks and other recreational facilities, and to contract, generally, for said purposes. Clearly envisioned within the scope of BREC's statutory duties is the authority to contract for the construction of entrance or access roads and grade crossings necessary to afford the general public access to these public recreational facilities. We, therefore, conclude that the act of cash sale containing the stipulations relative to BREC's payment for the permanent access road and grade crossing is a valid legal obligation authorized by its statutory duty to contract for the development of public recreational facilities like Santa Maria Golf Course.
We further conclude that the expenditures, in question, serve a public purpose — i.e., that of affording the general public access to the Santa Maria Golf Course and its related facilities. The remaining issue is whether BREC's performance of the legal obligation creates a benefit for the public proportionate to the cost involved.
The expenditures will make it possible for the general public of the State of Louisiana to utilize one of the finest public golf courses in this state for a relatively nominal fee. While this benefit is somewhat intangible, it is, nevertheless, substantive, and one of the important contributions which government can make to the quality of life of its citizens. We therefore conclude that the financial obligations assumed by BREC relating to the access road and grade crossing are not so disproportionate to the public benefit to be realized so as to render them unconstitutional.
As noted above, the construction performed by Barber Brothers involved not only the permanent entrance road and related drainage, but other streets, sidewalks and drainage facilities. In light of this fact, invoices submitted to BREC for payment should represent costs related solely to the access road. Any unrelated payments would obviously violate the terms of the contract, as well as La. Const. Art. VII, Section 14 (A).
We also concur with your opinion that BREC's obligation for the railroad crossing is limited to the cost of the 100 foot grade crossing stipulated in the contract. Additional costs necessitated by the construction of a bridge or tunnel are not BREC's responsibility. We recommend that the appropriate cost and payment be based on reasonable estimates obtained by BREC.
In summary, this office is of the opinion that the payments to be made by BREC under the terms, conditions, and obligations of the contract of cash sale with Santa Maria are constitutional under Art. VII, Section 14 (A) and (C).
Trusting this to be of sufficient information, I remain
 Sincerely,
 RICHARD P. IEYOUB
 Attorney General
 BY:________________________
 ROBERT E. HARROUN, III
 Assistant Attorney General

OPINION NUMBER 92-127
Mr. Grover Austin, CPA. Attorney General of Louisiana — Opinion. March 15, 1993.
 Mr. Grover Austin, CPA Assistant to the Legislative Auditor 1600 Riverside North P.O. Box 94397 Baton Rouge, LA 70804-9397
RICHARD P. IEYOUB, Attorney General.
Dear Mr. Austin:
You have requested an opinion of the Attorney General regarding additional compensation to, and advertising practices of, clerks of district courts. Accompanying your request is a memorandum from the Director of your Investigative Division. The following summary of facts is drawn from your submissions:
The District Clerk of Court ("Clerk") produces a weekly publication called the "Clerk's Register." The Clerk sells this publication and deposits the proceeds from the sales in a special account that is being used for personal purposes. The publication was prepared by clerk of court employees using office equipment and postage. The Clerk is responsible for maintaining the information contained in the newspaper as part of his legislatively imposed duties.
Your first question is whether it is permissible for the Clerk to issue this publication containing information that the Clerk is responsible for maintaining as part of his official duties, and to retain the proceeds from the sale of the publication for personal use.
The Public Records law appears to allow a clerk of court, as custodian of the records, to provide copies to persons so requesting and to collect reasonable fees for same. See LSA-R.S.44:32(C). If the Clerk is disseminating public records information in a newspaper to persons frequently requesting it and charging reasonable fees for copies, this action appears to be within the ambit of the Public Records Law. However, the Clerk's annual compensation is fixed by law in LSA-R.S. 13:761
and 782. Any compensation the Clerk receives in excess of that set by statute, including fees generated by the distribution of the newspaper in question, should not be diverted for personal gain, but rather should be used for operations of the Office.
Your second question regards the same publication and asks if the Clerk's employees and equipment had not been used, would it be proper for the Clerk to distribute the publication for personal gain.
It is the opinion of this office that, regardless of whether the Clerk uses personnel and equipment belonging to the office in the publication of the newspaper, receiving fees for personal use in excess of his statutory compensation is legally impermissible. It is not the publication of the newspaper containing information the Clerk is responsible for maintaining as part of his official duties, but rather the personal gain above the maximum compensation allowed by law that is inappropriate.
You ask whether the Clerk's personal use of the fees derived from the publication of the newspaper violates any criminal or civil laws. With regard to criminal acts, we believe it would be more suitable that the appropriate district attorney address your questions. Therefore, we recommend that you contact the district attorney re possible violations of criminal statutes.
LSA-R.S. 42:1461 imposes a personal obligation on all public officials and employees, including clerks of court, not to misapply, convert, etc., any funds or property under the custody or control of the public entity in which the office or employment is held. The breach of this obligation gives rise to an action in favor of the public entity for the recovery of such funds or property.
Further, the above activity may be in violation of our Code of Governmental Ethics. Enclosed is a copy of Advisory Opinion No. 91-037, issued on June 28, 1991, by the Board of Ethics for Elected Officials (the "Board"). You may wish to submit the factual scenario involving these activities to the Board for its review.
You next state that it has been alleged that the Clerk placed books of poems paid for with public funds in hospitals located within the parish. The books contain an inscription informing the reader that the Clerk and his staff are responsible for its being placed in the hospital. The inscription contains the Clerk's name.
You question the propriety of such action and state that you believe the expenditure to be in violation of LSA-R.S. 43:111.1.
LSA-R.S. 43:111.1 provides as follows:
 "No public funds shall be used in whole or in part for the payment of the cost of any advertisement containing therein the name of any public official whether elected or appointed; provided, however, that the provisions of this section shall in no case be construed to apply to advertisements or notices required or authorized by law to be published or to any advertisements placed by any public agency or body authorized by law to advertise in the furtherance of its functions and duties."
Attorney General Opinion No. 90-126A, contains a notable discussion of advertising. This opinion states that a legal distinction must be made between lawful public information and unlawful public relations, a distinction which is well-settled in Louisiana law. The opinion also points out that the Attorney General adopts the distinction stated in the Louisiana Constitution, as interpreted and explained by Godwin v.East Baton Rouge Parish, 372 So.2d 1060 (La.App. 1 Cir. 1979. The distinction was also adopted for general application to this issue without limitation to the election campaigns in Godwin.
That case provides the legal basis for the interpretation expressed in Opinion No. 90-126A that the use of public funds to finance public techniques to manipulate public opinion or public issues to create a body of public opinion favorable to a public official or entity, is ultra vires. The use of public funds to provide a public information function of a state office is integral to its constitutional and/or statutory power and function and is lawful if its intent is to be factually informative to the public. The public information function recognized as lawful is consistent with democratic values and essential to conformation to them by the government. Fact-based information disseminated to the public fosters public trust, and facilitates public respect for government.
That opinion also points out that the expenditure of public funds for fact-based information is not unlawful per se. It is the purpose for which the public funds are spent, and the intent of the public official who makes the expenditure which control the legal character of the expenditure.
Initially, there is a question as to whether the publication with inscription constitutes an advertisement. This office has previously construed the term "advertisement" to mean a public notice which is usually published in the mass media of broadcast over the air. See Attorney General Opinion Nos. 92-484 and 83-57. We have no indication of how many books were placed in the various hospitals. However, the publication in question, does not appear to have been disseminated to the public, generally, through newspapers, radio, or television. Hence, we conclude it is not an "advertisement" as that used in LSA-R.S.43:111.1. We now focus upon the applicability of ArticleVII, § 14 of the Louisiana Constitution of 1974 on this issue.
Article VII, § 14(A) of the Louisiana Constitution (1974) provides the following with regard to public funds:
 "Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private."
The Supreme Court, adopting the jurisprudence interpreting an identical provision of the 1921 Constitution, has interpreted La. Const. Art. VII, § 14 (1974) to be violated "whenever the State or a political subdivision seeks to give up something of value when it is under no legal obligation to do so." City of PortAllen v. Louisiana Risk Management, Inc., et al., 439 So.2d 399,401 (La. 1983)
This requirement of a legal obligation to expend funds is the threshold but not the only predicate for the constitutionality of the expenditure. The expenditure must also be for a public purpose and create a public benefit proportionate to the cost. A public purpose and benefit is always presumed where the legal obligation to expend the funds is established by constitutional or statutory mandate. To enjoy this presumption, the legal authorization must be an obligation or public duty authorized by law. In other words, the purpose and power for the expenditure must be sanctioned by laws. The public officer or entity acts as an instrument of the law, and pursuant to the authority granted by law, rather than his or its perception of the public good.
To allow unrestricted expenditures of public funds by any and all political subdivisions, public agencies, entities or officers as long as those entities or persons can imagine some species of "public good" or "public benefit" resulting therefrom, would be to authorize a fragmentation and incoherence in fiscal policy at all levels of state government. This, Art. VII, § 14 seeks to prevent by requiring valid legal authority (even at the contractual level) for all alienations of public funds.
The effect of Art. VII, § 14, as interpreted by the Supreme Court and the Attorney General, is to give further constitutional protection and definition to the plenary power of the legislature over the public fisc, and to insure that political subdivisions conform to statewide general fiscal policy rather than formulate it on the basis of local expediency within their own territorial jurisdictions. The integrity of the constitutional power over the public fisc is, therefore, sustained by a statewide constitutional norm requiring a legal obligation for public expenditures that is either ordained by law, by the legislature or constitution, or authorized (i.e., power to contract) by the same source of law.
This office is unaware of any constitutional or statutory provisions which obligate the Clerk to distribute books of poems bearing an inscription containing his name to parish hospitals.
Although the Clerk's goals may be admirable and creative, the distribution of the publication constitutes a violation of Article VII, § 14. Further, we are of the opinion that the publication is more aligned to the concept of prohibited public relations rather than mere public information. This conclusion is consistent with those expressed in Attorney General Opinion Nos. 92-494, 92-204 and 77-933.
You further allege that the Clerk is the sponsor of a radio broadcast relating to sports and environment which is paid for from public funds. You question the propriety of this activity. We are of the opinion that if the Clerk is identified by name during the course of the radio broadcast, LSA-R.S. 43:111.1 has been violated. Unlike the book of poems, the radio broadcast falls within the definition of "advertisement" as that term is used in Section 111.1. Further, and even in the absence of the Clerk's name, the expenditure of public funds for this purpose constitutes a violation of Article VII, § 14 for the same reasons discussed in answer to your previous question. See also Attorney General Opinion Nos. 92-737, 76-713, 75-1111, and 75-589.
You finally allege that the Clerk spends time researching oil and gas records for an oil company during office hours and receives compensation, in addition to his statutory salary, from the company. You question the propriety of this transaction.
We believe the same analysis applies to this question as applied to your first question regarding the weekly publication. Thus, we reach the same conclusion.
Trusting the above answers adequately respond to your request, I remain
 Yours very truly,
 RICHARD P. IEYOUB
 Attorney General
 BY:__________________________
 ROBERT E. HARROUN, III
 Assistant Attorney General

 BOARD OF ETHICS FOR ELECTED OFFICIALS
DATE: June 28, 1991 ADVISORY OPINION NO. 91-037
RE: The earning of outside income by clerks of court through activities relating to their offices' operations.
The Board of Ethics for Elected Officials has received information suggesting that some Louisiana clerks of court may be earning outside income through publishing, research or other activities that relate to the filings, records and activities of their clerk of court offices. Out of a concern that this practice may not be confined to those particular cases of which the Board has become aware, the Board is issuing this general advisory opinion for the purpose of advising all Louisiana clerks of court of the applicable provisions of the Code of Governmental Ethics, which provisions have the effect of substantially limiting a clerk of court's ability to engage in such activities on a privately compensated basis.
It should be noted that the jurisdiction of the Board of Ethics for Elected Officials is limited to the administration and enforcement of the Code with regard to elected officials. The provisions of the Code discussed in this opinion are also applicable to employees of clerks of court offices; however, the Board of Ethics for Elected Officials has no jurisdiction or authority with regard to enforcing the Code as to those employees. Rather, administration and enforcement of the Code with respect to all non-elected officials and employees is within the jurisdiction of the Louisiana Commission on Ethics for Public Employees.
The provision of the Louisiana Code of Governmental Ethics that is applicable to this general issue is Section 1111 C(1)(a) of the Code, which provides as follows:
§ 1111. Payments from nonpublic sources
* * * * *
C. Payments for nonpublic service.
 (1) No public servant shall receive any thing of economic value for any service, the subject matter of which:
 (a) Is devoted substantially to the responsibilities, programs, or operations of the agency of the public servant and in which the public servant has participated;. . . .
The term "service" is defined in Section 1102 (24) of the Code to mean "the performance of work, duties, or responsibilities, or the leasing, rental, or sale of movable or immovable property." Pursuant to this definition, a "service" includes not only work such as research, but also the sale of publications or similar items.
In short, this provision has the impact of prohibiting a clerk of court from earning any outside income for the performance of any services or the publication of any materials if the subject matter of the work or publication is substantially related to the operations of the clerk of court's office. The Board construes this section of the Code as prohibiting a clerk of court from selling any service, publication or information concerning the records, filings, or other particular operations of the clerk of court's office. Examples of such prohibited outside work include, but not by way of limitation, title asbstract work, title research, copy services, court calendar services, newsletters, etc.; that is, any service that relates to the clerk of court's office.
In understanding this prohibition it should be noted that the prohibition may be applicable even in situations in which the activity at issue is not a service or publication that is required to be provided by the clerk of court. Rather, the thrust of Section 1111 C(1)(a) of the Code is to address those situations where income may be earned through activities that are not a requirement of an official's public duties, but are substantially related to his agency's activities.
A copy of this opinion is being mailed to all Louisiana clerks of court. The Board's intent is to put all Louisiana clerks of court on notice of the requirements of Section 1111 C(1)(a) of the Code and of the Board's interpretation of these provisions. This opinion should be read broadly to address any situations in which clerks of court are earning any outside income with respect to publications, research, or any service that relates to the records, filings, information, or activities of the clerk of court's office.
The Board will issue advisory opinions, upon written request, to any clerk of court who has a question concerning whether any particular activity in which he or she is engaged is prohibited by Section 1111 C(1)(a) of the Code.
s/Robert L. Roland s/Edwards Barham
Robert L. Roland, Chairman Edwards Barham, Member
s/Harry McCall, Jr. s/Carlos G. Spaht
Harry McCall, Jr., Vice-Chairman Carlos G. Spaht, Member
s/Dr. John Tassin
Dr. John Tassin, Member
OPINION NUMBER 93-787
Mr. Michael D. Hebert. Attorney General of Louisiana — Opinion. January 7, 1994.
 90-A-2 PUBLIC FUNDS — Loans, Pledge or Grants
La. Const. Art VII, Sec. 14
 General discussion of cooperative endeavors and the factors which must be present for City of Lafayette's contracts with "external agencies" to be constitutionally sanctioned.
 Mr. Michael D. Hebert Assistant City Attorney 600 Jefferson Street, Box 52 Suite 504 Lafayette, Louisiana 70501
RICHARD P. IEYOUB, Attorney General
Dear Mr. Hebert:
In your capacity as an Assistant City Attorney to the City of Lafayette, you have requested the opinion of this office regarding contracts of the City of Lafayette with private and/or non-profit entities, referred to in your letter as "external agencies". You advise that the City of Lafayette, in furtherance of the duties and purposes of the City's Department of Community Development, has entered into, and will enter into, certain contracts with external agencies for the provision of various social services or educational, recreational, or cultural programs within the City of Lafayette.
Specifically, you have asked this office to address whether such contracts constitute prohibited donations of public funds under Article VII, Section 14 of the Louisiana Constitution of 1974.
According to your letter, the funds paid to each external agency by the City of Lafayette are paid only in accordance with the contract, and payments are only made for services which are consistent with, and supportive of, the duties and functions of an established department of the City of Lafayette. You also advise that all services provided by the external agencies will be provided within the City of Lafayette. Furthermore, you advise that each external agency is required to make progress reports and an accounting to the City, and that each external agency is subjected to audits by the City in order to verify that the funds are being used for the public purpose set forth in each contract.
Your question raises a number of issues, as it is presented broadly, as opposed to being limited to a particular contract, for particular services, with a particular "external agency".
As I am sure you are aware, the mere execution of a document nominated as a "contract" does not obviate the constitutional prohibition of donations of public funds by political subdivisions. However, Art. VII, Sec. 14(C) authorizes the state and its political subdivisions to engage in "cooperative endeavors" for a public purpose with other governmental agencies, public or private corporations, or individuals. This office has previously opined that a constitutionally sanctioned cooperative endeavor must meet a three part test: (a) the public agency has a legal obligation to expend public funds, (b) the expenditure must be for a public purpose, and (c) the expenditure must create a public benefit proportionate to its cost. Attorney General's Opinion No. 93-164.
In our opinion, contracts such as the ones you describe can be considered constitutionally sanctioned cooperative endeavors as long as the contracts meet the three part test set forth above.
As you are aware, the requirement for a "legal obligation" for the expenditure or transfer of public funds has been recognized by the Louisiana Supreme Court in City of Port Allen v.Louisiana Municipal Risk Management Agency, Inc., 439 So.2d 399
(La. 1983). As stated in the City of Port Allen decision, "even if political subdivisions cooperate for a public purpose, they still may not give away their assets . . . merely for a public purpose." As we interpret that decision, the "legal obligation" referred to in City of Port Allen must be present even if the "external agency" provides a public benefit or service, and even if the services provided are "consistent with, and supportive of the duties and functions of an established Department of the City of Lafayette".
This office has construed the "legal obligation" requirement referred to in the City of Port Allen decision to be a requirement that the purpose and power for a particular expenditure of public funds be "sanctioned" or "authorized by law" or in the "discharge of a legal duty". Attorney General's Opinion No. 92-204. Our opinions also refer to the requirement of "an underlying legal obligation or authority" for the transfer of public funds. Attorney General's Opinions Nos. 92-543, 92-494, 92-402, 92-204.
Your letter suggests that the Supreme Court, in City of PortAllen, may not have been attempting to announce the requirement of a `legal obligation' as a hard and fast rule. We respectfully disagree with your suggestion, as the Court has subsequently adhered to its requirement of a `legal obligation' or `legal duty'. In Guste v. Nicholls College Foundation, 564 So.2d 682
(La. 1990), a transfer of public funds by the Nicholls College Foundation was held to be "given and accepted `under the authority of the constitution and laws of this state' in furtherance of a governmental purpose", as opposed to a donation. The Court concluded that the funds were "transferred in the discharge of the Federation's constitutional or legalduties", and were accepted by the Foundation, "with a commitment to assist the Federation in carrying out its constitutional andlegal duties". (Emphasis added).
This office's recognition of the necessity of a "legal obligation" for the transfer of public funds is illustrated by Attorney General's Opinion No. 92-494, which provides that an assessor has no "legal obligation" to fund a teen organization or a mental health unit, and by Attorney General's Opinion No. 92-204, which provides that a hospital service district cannot pay the Chamber of Commerce dues of its hospital physician.
You have also requested this office to give consideration to the argument that "remunerative donations" may not be constitutionally prohibited. In light of our opinion that a legal obligation for the expenditure of public funds must be present if same is to be considered constitutionally sanctioned, a discussion of "remunerative" donations is pretermitted.
 Yours very truly,
 RICHARD P. IEYOUB
 Attorney General
 BY:__________________________
 JEANNE-MARIE ZERINGUE
 Assistant Attorney General

OPINION NUMBER 95-141
Dannye W. Malone. Attorney General of Louisiana — Opinion. May 10, 1995.
61 Laws-General
72-1 New Industry
84 Parishes
 90-A-2 Public Funds-Loan Pledge or Grants Taxation-Property Taxes
 Article VII, Section 14 of the 1974 Louisiana Constitution La. C.C.P.R.S. 33:130.52, 9020, et seq., 9021, 9022, 9023, 9031, 9034; 39:704 and 51:1151, et seq., and 1201
 Parish Commission may, through a non-profit Foundation organized for industrial and/or economic inducement purposes, expend ad valorem tax revenues to loan funds to a private corporation pursuant to a written cooperative endeavor agreement.
 Dannye W. Malone Parish Attorney for the Parish of Caddo, State of Louisiana Caddo Parish Commission Building 525 Marshall Street — Suite 300 Shreveport, Louisiana 71101
RICHARD P. IEYOUB, Attorney General
Dear Mr. Malone:
You have requested an opinion of the Attorney General regarding the Biomedical Research Foundation of Northwest Louisiana ("Foundation"), a non-profit corporation which has been granted tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. You state that in early 1993, the Foundation requested an opinion from this office on the issue of whether the Caddo Parish Commission ("Commission") was authorized to hold an election for the purpose of levying an ad valorem tax to promote economic development through the Foundation.
In Attorney General Opinion No. 93-22, the author concluded that the Commission was authorized to call such an election and to place before the voters the following proposition:
 "Shall the Parish of Caddo, State of Louisiana (the `Parish'), levy a special tax of two (2) mills on all property subject to taxation in the Parish for a period of five (5) years beginning with the year 1993, for the purpose of promoting economic development through the Biomedical Research Foundation of Northwest Louisiana, such economic development including appropriate scientific and education programs and assistance, with the proceeds of said tax to be used for any lawful purpose for which the Parish may expend public funds and which is intended to encourage and assist in the location, development or expansion of industrial, manufacturing, commercial or professional businesses or concerns?"
The tax proposition was approved by the electorate on April 3, 1993. The Commission and the Foundation subsequently entered into a cooperative endeavor agreement in accordance with the recommendations contained in Opinion No. 93-22. The Agreement details the economic development activities to be undertaken by the Foundation.
Central to the Foundation's planned initiatives is the development of a science, research and technology park in Caddo Parish. The anchor tennant for the technology and research park is to be ICON Industrial Controls Corporation ("ICON"). The Foundation and ICON have entered into an agreement whereby the Foundation will provide an interim facility and certain operating expenses for ICON through loans aggregating $3.2 Million over a thirty-month period from the Foundation to ICON. In return, ICON will locate its permanent headquarters and offices, as well as all of its other programs and facilities, in the Foundation's science, research and technology park for a minimum of fifteen years. Furthermore, beginning no later than forty-two months after September, 1994, ICON will repay the Foundation the funds advanced to it, amortized over a seven and one-half year period, at an interest rate of local prime plus one-half percent.
You specifically ask whether the Foundation may loan funds generated by the ad valorem tax to ICON in accordance with the terms of the Agreement between the Foundation and ICON, discussed supra.
This issue must be examined in light of Article VII, Section 14
of the Louisiana Constitution of 1974 which provides, in pertinent part, the following:
 "§ Section 14. (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. . . .
* * *
 (C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation, or individual."
A very comprehensive analysis of the above Section, as it relates to the expenditure and/or use of public funds was undertaken by this office in Attorney General Opinion No. 90-651. As noted therein, the constitutional norm for the lawful use of public funds and property is found in Section 14. As quoted above, Paragraph (A) generally prohibits the loan, pledge, or donation of public funds.
Paragraph (C) of Section 14 authorizes the state and its political subdivisions (i.e., the Commission, through the Foundation), to engage in cooperative endeavors for a public purpose with other governmental agencies, public or private associations and corporations and/or individuals. However, Paragraph (C) merely supplements the prohibition against donations contained in Paragraph (A). It does not create an exemption or exception from the general constitutional norm. In other words, the cooperative endeavor must meet the general standards for the non-gratuitous alienation of public funds established in Paragraph (A). City of Port Allen v. LouisianaRisk Management, et al, 439 So.2d 399 (La. 1983) and Attorney General Opinion No. 90-651.
In City of Port Allen, the Supreme Court ruled:
 "The cases that do exist [under La. Const. Art. IV § 12 (1921)] hold primarily that this section is violated whenever the state or political subdivision seeks to give up something of value when it is under no legal obligation to do so. . . .
* * *
 Section 14(C) does not help the state, either. There is no indication that it is meant to be an exception to the rule of § 14(A); the exceptions are clearly contained in § 14(B). Thus, even if political subdivisions cooperate for a public purpose they still may not give away their assets to other political subdivisions, the United States Government, or public or private associations or corporations, or to individuals merely for a `public purpose'." (Emphasis added.)
The threshold requirement of the constitutional doctrine for distinguishing between invalid and lawful expenditures and transfers of public funds and property is the presence of a legal obligation or duty by the transferor to alienate said funds or property. See also Beard-Poulan, Inc. v. Dept. of Highways,362 F. Supp. 547 (W.D. La. 1973) and Town of Brusly v. West BatonRouge Parish Police Jury, 283 So.2d 288 (La.App. 1st Cir. 1973).
This prerequisite is satisfied by the presence of a valid
statute, ordinance, charter or contract. The vehicle by which the obligation is created may, nevertheless, be ultra vires or unconstitutional if it creates no binding legal obligation or if the obligation created is substantially inconsistent with, or beyond the scope of the Commission's authorized duties. Attorney General Opinion No. 90-651.
As noted above, the requirement of a legal duty is the threshold, but not the only predicate for the constitutionality of the expenditure. Second, the expenditure must also be for a public purpose. Third, the expenditure must create a public benefit proportionate to the cost (i.e., the amount expended). Attorney General Opinion Nos. 93-787, 92-722, 92-127 and 90-651.
The legal obligation/duty standard discussed above was applied by the Second Circuit Court of Appeal in James v. Rapides PoliceJury, 113 So.2d 88 (La.App. 2nd Cir. 1959). The Court adjudged the constitutionality of the police jury's payment to the Red River Valley Improvement Association, Inc. (Association), a nonprofit corporation chartered for the purpose of promoting and encouraging public interest in the development of the Red River Valley. The Court determined that the police jury had a legal obligation (i.e., statutory duty) to build levees, dikes, drainage canals, etc., and that duty encompassed the hiring of expert services and even the hiring of private organizations to perform the work the jury, itself, was obligated and empowered to undertake. However, the Court determined that the services rendered by the Association constituted public relations services which did not, in fact, build levees. Thus, the expenditure of public funds for that purpose was not within the scope of the statutory duty of the police jury.
James makes two other points of importance to this constitutional doctrine. The first is that the worthiness of the recipient and of the actual use of public funds is immaterial to the issue of the constitutionality of the transfer by the public entity. As the Court noted:
 "Though it may be regarded as an unnecessary comment, we think it is appropriate in the instant case to observe that these specific prohibitions have been wisely implanted in our fundamental law, for it is conceivable that without such prohibitions the State, or a political subdivision thereof, might so deplete the public fisc by contributions to almost innumerable worthy private and semi-public enterprises as to seriously impair the necessary expense of conducting more prosaic but more important governmental functions."
In other words, to allow unrestricted expenditures of public funds by any and all political subdivisions, public agencies, entities or officers, as long as those entities or persons can imagine some species of "public good" or "public benefit" resulting therefrom, would be to authorize a fragmentation and incoherence in fiscal policy at all levels of state government. This, Article VII, § 14 seeks to prevent by requiring a valid
legal authority (even at the contractual level) for all alienations of public funds. The effect of Article VII, § 14, as interpreted by the Supreme Court and the Attorney General, is to give further constitutional protection and definition to the plenary power of the legislature over the public fisc, and to insure that political subdivisions conform to statewide general fiscal policy rather than formulate it on the basis of local expediency within their own territorial jurisdictions.
The second important statement of James is that custom, as expressed in the doctrine of contemporaneous construction, can not modify or negate the operation of the prohibition of Article VII, Section 14. In James, the police jury had been making these same payments to the Association for approximately ten years. Regardless of how long or how often any governmental entity has transferred funds to others, public or private, the duration and repetition of that practice does not create an exemption to the prohibition of Article VII, Section 14 by eithercontra legem custom or by the contemporaneous construction doctrine. Past illegality does not justify future illegality. La. Civ. Code Art. 3.
As can be seen from the above, the unequivocal prohibition established by Article VII, Section 14 constitutes one of the most enduring and formally consistent constitutional provisions in Louisiana law. Further, it has been consistently recognized and upheld by this office. Attorney General Opinion Nos. 94-515, 93-787, 93-766, 93-665, 93-558, 92-494, 91-104, 90-652, 89-180 and 84-871.
The initial issue to be determined regarding the loan, in question, is whether a valid legal duty or obligation exists for the Commission through the Foundation, to alienate its funds for this purpose. As previously noted in Opinion No. 93-22, the Commission has the power and authority to engage in economic and/or industrial development. The Louisiana Legislature has confirmed that this authority as essential to the economic growth of this state through various legislatively enacted economic and/or industrial development programs, including those evidenced by R.S. 33:130.52, 33:9020, et seq., 51:1151, et seq. and 51:1201.
We note specifically the provisions of R.S. 33:9020 referred to as the "Cooperative Economic Development Law." Section 9021 expresses the legislative finding and declaration of necessity that local governmental subdivisions engage in cooperative endeavors with each other and with other public or private associations and/or corporations for the purpose of economic development to alleviate the conditions of unemployment, underemployment and other forms of economic distress. To accomplish this result, Section 9023 authorizes local governmental subdivisions to create non-profit economic development corporations with which public bodies may engage in cooperative endeavors, pursuant to Section 9031.
Section 9022 defines "cooperative endeavors" to mean any form of economic development assistance between the state, its local governmental subdivisions and/or private associations, corporations, individuals, etc. Section 9022 further provides:
 "The term `cooperative endeavors' shall include but not be limited to cooperative financing,
cooperative development, or any other form of cooperative economic development activity." (Emphasis added.)
Section 9022 further defines "cooperative financing" to mean:
 ". . . any method of financing an economic development project between and among the state, its local governmental subdivisions, political corporations, public benefit corporations, the United States or its agencies, or any public or private association, corporation, or individual. Said methods shall include loans, loan guarantees, land writedowns, grants, lease guarantees or any form of financial subsidy or incentive." (Emphasis added.)
Finally, Section 9034 authorizes a local governmental subdivision, by resolution or ordinance, to carry out the purposes set forth in the statutory provisions discussed above without the necessity of creating and organizing an economic development corporation.
As can be seen from the above, the Commission (through the Foundation) is vested with broad and sweeping statutory authority to expend public funds to implement plans and programs for economic development. Examples of such projects previously considered by this office are discussed in Attorney General Opinion Nos. 77-1328 (political subdivision is authorized to use general funds to purchase and develop real estate and construct building facilities in an attempt to induce industry into the parish if at the time said funds are to be expended there is a customer legally bound to reimburse the political subdivision for such an outlay of public funds), 78-1258 (city may expend public funds for the financing of loans to local development corporations pursuant to programs designed to provide greater employment opportunities for the needy and expand commerce and industry) and 81-979 (political subdivision may expend public monies for the rehabilitation and renovation of property used for industrial development purposes which will result in the direct or indirect granting of public money to a private profit-motivated enterprise).
Further, the law specifically recognizes, among the various forms of cooperative endeavors available to encourage economic development, that of cooperative financing through loans and loan guarantees between local government or subdivisions, political corporations and public or private associations or corporations. We, therefore, find the presence of a legal obligation or duty (i.e., a valid statute) for the alienation of the funds in question. We further conclude that the alienation is consistent with the purposes for which the tax proceeds may be expended as authorized by the tax proposition, quoted supra. R.S. 39:704.
It is also our opinion that the loan, in question, serves a public purpose. The ICON project will promote economic development in Caddo Parish by encouraging, assisting and enabling ICON to locate and expand its research and manufacturing endeavors in the science, research and technology park being developed by the Foundation. These endeavors will include a state-of-the-art Manufacturing and Robotics Sciences Center (MARS) and other developmental and technological programs. This will obviously result in the creation of badly needed employment opportunities for the citizens of the parish, increase the educational opportunities, broaden the tax base and improve the general overall quality of life. The remaining issue is whether the benefits discussed above to be derived by the public are proportionate to the ultimate cost to be incurred as a result of the loan transaction.
As previously noted, ICON must locate its headquarters and business operations in the Foundation's science, research and technology park. It must continue to conduct its business operations in the park for at least fifteen years. In addition, all of ICON's future development and technology programs and facilities must be located in the park. Finally, ICON must, no later than forty-two months after September, 1994, begin to repay the loan with an interest rate of local prime plus one-half percent.
Given this unique factual scenario, this office is of the opinion that the loan amount, in question, is not so disproportionate to the public benefits to be realized so as to violate the constitutional provisions contained in Article VII, Section 14.
In summary, it is the opinion of this office that the Biomedical Research Foundation of Northwest Louisiana may loan funds derived from an ad valorem tax dedicated to the purpose of promoting an economic development through the Foundation to ICON Industrial Controls Corporation in accordance with the terms and conditions of the above referenced and discussed agreement between the Foundation and ICON and pursuant to the statutory provisions contained in R.S. 33:9020, et seq. Our holding that this transaction does not violate Article VII, Section 14 of the Louisiana Constitution of 1974 and the specific tax proposition, in question, is strictly limited to this transaction and no other. The utilization of the tax revenues for any other purpose must and will be scrutinized on an individual basis. Further, we must emphasize that this opinion is limited to thelegality of the agreement between the Foundation and ICON.
Trusting this answers your inquiries, I am
 Very truly yours,
 RICHARD P. IEYOUB
 ATTORNEY GENERAL
 By: ________________________________
 ROBERT E. HARROUN, III
 Assistant Attorney General

OPINION NUMBER 01-0389
Mr. Steven J. Dupuis. Attorney General of Louisiana — Opinion. March 7, 2002.
90-A-2 PUBLIC FUNDS — Loan, Pledge or Grants
La. Const. Art. VII, Sec. 14
 General discussion of factors that must be present for the Lafayette City-Parish to fund various entities.
 Mr. Steven J. Dupuis City-Parish Attorney 515 West Convent Street Lafayette, Louisiana 70501
RICHARD P. IEYOUB, Attorney General
Dear Mr. Dupuis:
Reference is made to your request for an opinion of this office regarding whether or not state law would allow the Lafayette City-Parish Consolidated Government to fund various entities and organizations that have requested funding during FY 2001-2002. In this regard, you have attached a resolution of the City-Parish, which includes a list of 24 entities and a brief description of the purpose of the funding to each entity. All of the entities and organizations on the list appear to be private, as opposed to public entities.
Your letter also refers to La. Const. Art. VII, Sec. 14, paragraph (A) of which generally prohibits the loan, pledge or donation of public funds and property by the state and its political subdivisions. Exceptions to this prohibition are found in Paragraph (B), all of which, with one exception, are inapplicable to the issues at hand. In the case of some the entities included on the City-Parish's list, the exception found in paragraph (B)(1) is no doubt applicable. Specifically, that exception provides that the general prohibition of La. Const. Art. VII, Sec. 14(A) does not prevent . . . "the use of public funds for programs of social welfare for the aid and support of the needy".
Also applicable is Paragraph (C) of La. Const. Art. VII, Section 14, which authorizes public entities to engage in cooperative endeavors, for a public purpose, with other governmental agencies, public or private corporations, or individuals. However, Paragraph (C) supplements the prohibition against donations in Section 14(A). It does not create an exemption or exception from the general constitutional prohibition. The Louisiana Supreme Court has ruled that all cooperative endeavors authorized by Section 14(C), must also meet the general standard for the non-gratuitous alienation of public funds or property established by Section 14(A). See City of PortAllen v. La. Risk Management, et al, 439 So.2d 399, (La. 1983). See also: Attorney General's Opinion No. 93-787.
Despite the authorization of cooperative endeavors, Section 14(A) is nevertheless violated whenever the State seeks to give up something of value in the absence of a legal obligation to do so. In other words, only if the use of public funds or property is authorized by a valid legal obligation, will it be considered a constitutionally sanctioned cooperative endeavor. The requirement of a legal obligation to expend public funds or use public property is the threshold, but not the only predicate for the constitutionality of the expenditure or use. The expenditure or use must also be for a public purpose and create a public benefit proportionate to its cost. Attorney General Opinion Nos. 92-722 and 90-651.
The jurisprudence of this state also makes it clear that the worthiness of the contemplated use of public funds is immaterial to the constitutionality of a transfer of public funds. In Jamesv. Rapides Parish Police Jury, 113 So.2d 88 (La.App. 2nd
cir. 1959), the court interpreted La. Const. (1921) Art. IV, Sec. 12, a provision almost identical to the present Art. VII, Sec. 14(A). Therein, the court stated:
 "These specific prohibitions have been wisely implanted in our fundamental law, for it is conceivable that without such prohibitions the state, or a political subdivision thereof, might so deplete the public funds by contributions to almost innumerable worthy private and semi-public enterprises as to seriously impair the necessary expense of conducting more prosaic but important government functions." 113 So.2d at p. 93.
In examining the list of entities submitted by the City-Parish, we note that the proposed funding to at least some of the entities in question appears to be for the purpose of aiding the needy. By way of example, funding to the Bayou Girl Scout Council is listed as being for a program in low-income recreation centers and middle schools, and funding to the Salvation Army will be used to feed the hungry and the homeless. Other entities on the list, such as Faith House, also appear to provide services to the needy. Of course, the determination as to whether a particular entity included on the City-Parish Council's list serves the needy should be made by the City-Parish itself, as its officers and employees are in the best position to make such a determination.
In light of La. Const. Art, VII, Sec. 14(B)(1), funding for those entities that serve the needy is constitutionally permissible, as long as public funds are only utilized to provide relief or assistance to those who can be classified as "needy", and as long as those assisted with public funds are screened, pursuant to objective criteria, to insure that they are truly needy. See: Attorney General's Opinions No. 98-475, 94-157, 92-542. If the City-Parish does decide to appropriate funds to entities on behalf of the needy, we recommend that the City-Parish and each such entity enter into a written cooperative agreement in order to address the use of the funds in a constitutional and legal manner. See: Attorney General's Opinion No. 93-787. Although it is not our opinion that every cooperative endeavor must be reduced to writing, an agreement committed to writing is clear to those who read it, and is subject to less misunderstanding.
With regard to entities that do not provide services to the needy, we are unaware of any provision of law that would obligate the use of public funds for the endowment of any entity, despite its laudatory mission. As previously noted, the worthiness of the contemplated use of public funds is immaterial to the constitutionally of the transfer of public funds. James v. RapidesParish Police Jury, supra. In our opinion, if the transfer of funds to any of the listed entities were in the nature of an endowment or gift, then such transfer would constitute a donation, in violation of La. Const. Art. VII, Sec. 14. In accord: Attorney General's Opinion No. 95-211. On the other hand, if any of the entities or organizations referred to in your letter provides a service that would otherwise have to be provided by the Parish, then the provision of funding to that entity or organization would be in the nature of a constitutionally sanctioned cooperative endeavor.
With regard to cooperative endeavors, we call your attention to the Supreme Court's decision in Guste v. Nicholls CollegeFoundation, 564 So.2d 682 (La. 1990). Therein, a transfer of public funds by the Nicholls State University Alumni Federation to the Nicholls College Foundation was held to be "given and accepted `under authority of the constitution and laws of this state' in furtherance of a governmental purpose", as opposed to a donation. The Court concluded that the funds were "transferred in the discharge of the Federation's constitutional or legal duties", and were accepted by the Foundation "with a commitment to assist the Federation in carrying out its constitutional and legal duties". I am also enclosing herewith a copy of Attorney General's Opinion No. 93-787, made a part hereof by reference, which opinion was addressed to the Lafayette City Attorney's office in 1993. Opinion No. 93-787 goes into some detail about cooperative endeavors, and the factors that must be present if such arrangements are to be constitutionally sanctioned.
Since this office is not a finder of fact, we are not in a position to advise you as to which, if any, of the entities on the City-Parish Council's list can or should receive funding. We have however, endeavored herein to provide the Lafayette City-Parish with our opinion as to applicable law. The City-Parish Council must ultimately determine whether each entity provides governmental services to or on behalf of the City-Parish such that the entity deserves funding from the City-Parish. We hope that this opinion serves to provide guidance in that regard.
Please do not hesitate to contact us if we can be of assistance in other areas of the law.
 Very truly yours,
 RICHARD P. IEYOUB
 Attorney General
 BY: ________________________________
 JEANNE-MARIE ZERINGUE BARHAM

 OPINION NUMBER 93-787 90-A-2 PUBLIC FUNDS — Loans, Pledge or Grants
La. Const. Art. VII, Sec. 14
 General discussion of cooperative endeavor and the factors which must be present for City of Lafayette's contracts with "extent agancies" to be constitutionally sanctioned
 Mr. Michael D. Hebert Assistant City Attorney 600 Jefferson Street, Box 52 Suite 504 Lafayette, Louisiana 70501
Dear Mr. Hebert:
In your capacity as an Assistant City Attorney to the City of Lafayette, you have requested the opinion of this office regarding contracts of the City of Lafayette with private and/or non-profit entities, referred to in your letter as "external agencies". You advise that the City of Lafayette, in furtherance of the duties and purposes of the City's Department of Community Development, has entered into, and will enter into, certain contracts with external agencies for the provision of various social services or educational, recreational, or cultural programs within the City of Lafayette.
Specifically, you have asked this office to address whether such contracts constitute prohibited donations of public funds under Article VII, Section 14 of the Louisiana Constitution of 1974.
According to your letter, the funds paid to each external agency by the City of Lafayette are paid only in accordance with the contract, and payments are only made for services which are consistent with, and supportive of, the duties and functions of an established department of the City of Lafayette. You also advise that all services provided by the external agencies will be provided within the City of Lafayette. Furthermore, you advise that each external agency is required to make progress reports and an accounting to the City, and that each external agency is subjected to audits by the City in order to verify that the funds are being used for the public purpose set forth in each contract.
Your question raises a number of issues, as it is presented broadly, as opposed to being limited to a particular contract, for particular services, with a particular "external agency".
As I am sure you are aware, the mere execution of a document nominated as a "contract" does not obviate the constitutional prohibition of donations of public funds by political subdivisions. However, Art. VII, Sec. 14(C) authorizes the state and its political subdivisions to engage in "cooperative endeavors" for a public purpose with other governmental agencies, public or private corporations, or individuals. This office has previously opined that a constitutionally sanctioned cooperative endeavor must meet a three part test: (a) the public agency has a legal obligation to expend public funds, (b) the expenditure must be for a public purpose, and (c) the expenditure must create a public benefit proportionate to its cost. Attorney General's Opinion No. 93-164.
In our opinion, contracts such as the ones you describe can be considered constitutionally sanctioned cooperative endeavors as long as the contracts meet the three part test set forth above.
As you are aware, the requirement for a "legal obligation" for the expenditure or transfer of public funds has been recognized by the Louisiana Supreme Court in City of Port Allen v.Louisiana Municipal Risk Management Agency, Inc., 439 So.2d 399
(La. 1983). As stated in the City of Port Allen decision, "even if political subdivisions cooperate for a public purpose, they still may not give away their assets . . . merely for a public purpose." As we interpret that decision, the "legal obligation" referred to in City of Port Allen must be present even if the "external agency" provides a public benefit or service, and even if the services provided are "consistent with, and supportive of the duties and functions of an established Department of the City of Lafayette".
This office has construed the "legal obligation" requirement referred to in the City of Port Allen decision to be a requirement that the purpose and power for a particular expenditure of public funds be "sanctioned" or "authorized by law" or in the "discharge of a legal duty". Attorney General's Opinion No. 92-204. Our opinions also refer to the requirement of "an underlying legal obligation or authority" for the transfer of public funds. Attorney General's Opinions Nos. 92-543, 92-494, 92-402, 92-204.
Your letter suggests that the Supreme Court, in City of PortAllen, may not have been attempting to announce the requirement of a `legal obligation' as a hard and fast rule. We respectfully disagree with your suggestion, as the Court has subsequently adhered to its requirement of a `legal obligation' or `legal duty'. In Guste v. Nicholls College Foundation, 564 So.2d 682
(La. 1990), a transfer of public funds by the Nicholls College Foundation was held to be "given and accepted `under the authority of the constitution and laws of this state' in furtherance of a governmental purpose", as opposed to a donation. The Court concluded that the funds were "transferred in the discharge of the Federation's Constitutional or legalduties", and were accepted by the Foundation, "with a commitment to assist the Federation in carrying out its constitutional andlegal duties". (Emphasis added).
This office's recognition of the necessity of a "legal obligation" for the transfer of public funds is illustrated by Attorney General's Opinion No. 92-494, which provides that an assessor has no "legal obligation" to fund a teen organization or a mental health unit, and by Attorney General's Opinion No. 92-204, which provides that a hospital service district cannot pay the Chamber of Commerce dues of its hospital physician.
You have also requested this office to give consideration to the argument that "remunerative donations" may not be constitutionally prohibited. In light of our opinion that a legal obligation for the expenditure of public funds must be present if same is to be considered constitutionally sanctioned, a discussion of "remunerative" donations is pretermitted.
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: ________________________________ JEANNE-MARIE ZERINGUE Assistant Attorney General
OPINION NUMBER 02-0125
John M. Crum, Jr. Attorney General of Louisiana — Opinion. May 21, 2002.
90-1 Port Commissions
 90-A-2 Public Funds-Loan, Pledge or grants La. Const. Art VII, Sec. 14 (1974)
 The reasonableness of the expenditure, not the particular item of food or beverage consumed at business lunches or dinners where there is a duty or obligation which serves an undisputed public purpose and public benefit, clients or customers from the private sector are the primary attendees, and where the expenditure is not disproportionate to the value of the public funds expended determines if an expenditure is a prohibited gratuitous alienation of public funds.
 John M. Crum, Jr. District Attorney Fortieth Judicial District Parish of St. John the Baptist P.O. Box 99 Edgard, LA 70049
RICHARD P. IEYOUB, Attorney General
Dear Mr. Crum:
You have requested an opinion of this office regarding the South Louisiana Port Commission or its agents purchasing alcoholic beverages for its customers during lunches or dinners.
Although there is no specific statutory prohibition regarding the purchase of alcoholic beverages with state funds, there are laws which regulate handling and disbursing public funds in general. Article VII, Section 14 of the Louisiana Constitution (1974) states:
 Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private.
This office has long recognized the caution which must be exercised when faced with the expenditure of public funds. Historically, the Attorney General has followed the interpretation of the Louisiana Supreme Court in City of PortAllen v. Louisiana Mun. Risk, 439 So.2d 399 (La. 1983) wherein the Court states:
 The cases that do exist hold primarily that this Section is violated whenever the state or a political subdivision seeks to give up something of value when it is under no legal obligation to do so. Attorney General Opinion No. 90-63.
The above referenced opinion further states:
 The Attorney General has further interpreted this provision of the constitution to require that the use of public funds not only be sanctioned by a legal duty or obligation, but serve a public purpose and create a public benefit not disproportionate to the value of the public funds expended. Attorney General Opinion No. 90-63.
In order to address the present query regarding the legality of purchasing alcoholic beverages for customers during lunches or dinners, we will examine the request in light of the above three-prong test.
Applying the analysis in Attorney General Opinion 90-63, the first issue is whether the South Louisiana Port Commission has any legal obligation to develop commerce. Louisiana Revised Statute 34:2473 which addresses the rights and powers of the commission and executive director for the Port of South Louisiana gives broad power to the executive director and the commission to "contract for legal, financial, engineering, and other professional services necessary and expedient in the conduct of the port's affairs", to "regulate commerce and traffic", and "acquire property and construct or acquire and equip wharfs and landings".
Louisiana Revised Statute 34:2473.1B states:
 In order to stimulate the commerce and industry in the port area and to protect the public in its lives, health, and property, the port, in addition to any other rights, powers, or authority granted to it, may provide services for and regulate the traffic and commerce within the port area in such a manner as may in its judgment be for the best interest of the public.
The powers enumerated in the above cited statutes clearly provide that the South Louisiana Port District was created for the benefit of the people of the State of Louisiana for the increase of their commerce and prosperity and for the improvement of their health and living conditions. The statutory authority which empowers the Port Commission to act necessarily creates a duty or obligation to develop commerce which serves a public purpose and provides a public benefit. Regarding part one of the three-prong test and based on the statutory duty of the Port Commission to develop commerce, legitimate expenditures that are an inherent part of that duty are not prohibited gratuitous alienations under Art. VII, Sec. 14.
Secondly, custom is a valid source of law, Louisiana Civil Code Article I, and may be relied upon to interpret positive law where it is silent or ambiguous. Attorney General Opinion 90-63. The positive law of Louisiana is silent regarding the lawfulness of the use of public funds for purchasing alcoholic beverages. Examining the customary practice at functions such as lunches and dinners wherein private sector commercial clients or customers are entertained, there is no question that meals are an integral part of commercial interaction. Further, the custom and current business practice is for the host to offer the client or customer a beverage of his or her choice, without excluding any particular category of beverages, such as caffeine versus non-caffeine, diet versus non-diet or alcoholic versus non-alcoholic.
Finally, in order to further address the present query regarding the propriety or the legality of purchasing alcoholic beverages for customers during lunches or dinners, we must examine the request in light of the requirement that expenditures serve a public purpose and create a public benefit not disproportionate to the value of the funds expended.
Several prior Attorney General Opinions have stated that alcoholic beverages may not be paid for with public funds. For example, Attorney General Opinion No. 99-358 states:
 The cost of meals must be reasonable and the cost of alcoholic beverages may not be paid from public funds.
In the scenario described in Attorney General Opinion No. 99-358, the entertainment of potential clients was not a motivating factor for the meal but was incidental to the fact that a meal was routinely served to attendees in conjunction with the regularly scheduled monthly meeting of the Port Commission.
In describing the expenditure of state funds for a hospitality suite at a Clerks of Court Association convention, Attorney General Opinion No. 90-63 states:
 The expense for [a hospitality suite] is incidental to the lawful purpose of the convention and therefore constitutional. However, in order to meet the public benefit test, the expense must be reasonable for your purpose of providing a convenient place for clerks and their deputies to meet and talk. Champagne alcoholic beverages and caviar are unreasonable; coffee, soft drinks and doughnuts are reasonable.
The purpose of the Clerks of Court Association hospitality suite where public officials were attending an educational seminar was to "facilitate professional interaction." Under the circumstances of an educational seminar attended by public officials, serving alcoholic beverages was considered to be unreasonable.
As stated in Attorney General Opinion No. 90-63:
 In order to meet the proportionality of the public benefit test the expense must be reasonable. . . .
In reference to the Clerks of Court hospitality suite, this office stated, "champagne, alcoholic beverages, and caviar are unreasonable; coffee, soft drinks and doughnuts are reasonable." In the scenario described therein, we concur. Factors such as the overall expense, the location of the meal, the participants and attendees at the meal, the public purpose and public benefit of the meal determine what is reasonable under the circumstances.
An official in the Office of the Legislative Auditor states that the current practice for the auditor's office is to examine the reasonableness of the expenditure in relation to the nature of the expenditure. If the expenditure is reasonable and necessary to accomplish a public purpose, the expense usually is allowed. Thus, one could surmise that serving champagne and caviar at an educational seminar remains unreasonable, whereas serving wine at a dinner to entertain commercial, private sector clients where the public purpose is to develop commerce for the public benefit would not be unreasonable.
The increasing demand upon governmental services and the present decline in the national and local economy along with the current emphasis on economic development in order to broaden the revenue base in Louisiana, all are factors that combine to require us to examine the parameters of "reasonableness" in light of current business practices. There must be a balance of reasonable expenditures at business lunches or dinners where clients or customers from the private sector are the primary attendees, where the agenda has an undisputed public purpose and public benefit, and where the expenditure is not disproportionate to the value of the public funds expended. It is not a matter of whether one eats donuts or duck, drinks coffee or chardonnay that is the primary consideration. The primary concern is the reasonableness of the expenditure under the circumstances.
Under the strictest interpretation of LA Constitution, Art. VII, Sec. 14 (1974), providing even "coffee, soft drinks and donuts" is a prohibited gratuitous alienation of public funds. Thus, this office has developed the three-prong reasonableness test examining the legal obligation of the public officials combined with the public purpose and public benefit of the event. The "reasonableness" of the expenditure under the circumstances-not the specific item of food or beverage consumed — is controlling.
The question regarding the purchase of alcoholic beverages for a public official or public employee with public funds has not been addressed in this opinion as this issue is outside the parameters of the inquiry. However, keeping in mind the balancing of the above discussed factors, the Port of South Louisiana should establish clear and definitive guidelines for the Commission regarding the expenditure of public funds and submit these guidelines to the Office of the Legislative Auditor for review before incurring any expenditure of public funds.
Trusting this discussion is sufficient to answer your concerns, I am
 Very truly yours,
 RICHARD P. IEYOUB
 ATTORNEY GENERAL
 BY: _________________________
 SUE McNABB
 Assistant Attorney General